**THE LANIER LAW FIRM, P.C.**
W. MARK LANIER, *Pending Pro Hac Vice*
wml@lanierlawfirm.com
KENNETH W. STARR, *Pending Pro Hac Vice*
ken.starr@lanierlawfirm.com
KEVIN P. PARKER, *Pending Pro Hac Vice*
Kevin.parker@lanierlawfirm.com
BENJAMIN T. MAJOR, *Pending Pro Hac Vice*
ben.major@lanierlawfirm.com
10940 W. Sam Houston Pkwy N, Suite 100
Houston, Texas 77064
Tel:  713-659-5200

**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES LLP**
PAUL L. HOFFMAN (71244)
hoffpaul@aol.com
JOHN H. WASHINGTON (315991)
jwashington@sshhzlaw.com
200 Pier Avenue, #226
Hermosa Beach, CA 90245
Tel: (310) 396-0731

HELEN I. ZELDES (220051)
hzeldes@sshhzlaw.com
BEN TRAVIS (305641)
btravis@sshhzlaw.com
501 W. Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-4990

*Attorneys for Plaintiff Mr. Ning Xianhua*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| NING XIANHUA, an individual<br><br>Plaintiff,<br>v.<br><br>OATH HOLDINGS, INC., f/k/a YAHOO! INC. and as successor in interest to YAHOO! INC.; ALTABA INC., f/k/a YAHOO! INC. and as successor in interest to YAHOO! INC; TERRY SEMEL, an individual; and JERRY YANG, an individual, and DOES 1-10<br><br>Defendants. | Case No.: _____<br><br>**ORIGINAL COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>(1) ALIEN TORT STATUTE<br>(2) TORTURE VICTIM PROTECTION ACT<br>(3) UNFAIR COMPETITION (UCL) |

Plaintiff NING XIANHUA (**Mr. Ning**), by and through his undersigned attorneys, complains and alleges the following:

## INTRODUCTION

1.      In May of 1989, hundreds of thousands of Chinese students and workers gathered at Beijing's Tiananmen Square to protest peacefully in favor of democracy and improved conditions for China's working class. On June 4, 1989, China's communist regime ordered the Chinese military to remove the protesters from Tiananmen Square and to execute or arrest those who refused. The military violently removed the protesters, killing thousands of them in the process by firing on them with assault rifles and running over them with armored vehicles.

2.      Since the Tiananmen Square massacre, the Chinese communist regime has imposed tight censorship policies throughout the country. China's communist regime has virtually erased the massacre from China's history along with the pro-democracy sentiment expressed by those brave protesters in 1989. However, Plaintiff Ning Xianhua and other Chinese nationals would not idly stand by. Risking their lives, they continued to serve as voices of the oppressed and mistreated. They resisted China's totalitarian communist regime. They fought for democracy and working-class rights. And they honored those who were murdered at Tiananmen Square by the Chinese communist regime.

3.      With the entry of Yahoo!'s internet search engine and electronic mail service into China, pro-democracy "dissidents" like Mr. Ning believed they would have improved access to information and to an email service that provided for discrete, confidential communications. They believed the "gateway to the internet" provided by Yahoo! would stimulate the call for democracy and fairness, preserve the memory of those who died on June 4, 1989, and allow all of this to be done while protecting their identities from Chinese communist authorities.

4.      But Mr. Ning and other pro-democracy activists did not know that Yahoo! Inc., its founder, Jerry Yang, and its CEO, Terry Semel, had secretly agreed to serve as an extension of China's communist regime by helping identify and imprison political dissidents like Mr. Ning. In exchange for access to the wealth they would gain from providing internet products to 110 million Chinese internet users, Yahoo! Inc., Yang, and Semel agreed to share confidential information and

2

Original Complaint and Jury Demand

communications of Yahoo! customers with Chinese communist officials in a joint effort to silence pro-democracy dissidents through arbitrary arrest, imprisonment, torture, and in some cases death. Pursuant to this agreement, the totalitarian communist regime received direct assistance from Defendants in their Sunnyvale, California headquarters to silence pro-democracy messages by punishing those who dared to utter them. The internet "gateway" touted by the Yahoo! Defendants became a snare, wielded by the Yahoo! Defendants to further the Chinese regime's repression of pro-democracy advocates.[1]

5.     Mr. Ning used his Yahoo! email account to privately spread pro-democracy messages and publications, coordinating with other activists through communications he believed to be secure. But pursuant to the agreement among Yahoo! Inc., Yang, Semel, and the Chinese communist regime, Yahoo! employees and agents turned over Mr. Ning's private information to the Chinese authorities. Based on that information, Mr. Ning was arrested and convicted for promoting democracy, and he suffered brutal beatings and torture for years.

6.     Mr. Ning finally escaped China's oppressive communist regime by seeking asylum in the United States. He subsequently learned that Yahoo! Inc., Terry Semel, Jerry Yang, and others presently unknown at Yahoo! are responsible for his arrest, torture, and resulting injuries. Mr. Ning is informed and believes, and thereupon alleges, that at all times relevant hereto Does 1 to 10, in addition to the named Defendants, are responsible in some manner for the conduct, damages, and injuries alleged herein. He seeks justice for the Yahoo! Defendants' complicity in the human rights violations he suffered at the hands of the Chinese regime because of their reprehensible conduct.

---

[1] In this Complaint, the corporate defendants are referred to as "Yahoo!," and all defendants are referred to collectively as the "Yahoo! Defendants." The Doe defendants (Does 1-10), whose identities are presently unknown are entities, officials or individuals within or affiliated with the Yahoo! Defendants and are in some way responsible for the violations and injuries to Mr. Ning alleged herein. Plaintiff will identify and serve such Doe Defendants as soon as their identities and the facts relevant to their responsibility are known.

Original Complaint and Jury Demand

**PARTIES**

7.      Plaintiff Ning Xianhua is a Chinese national who resides in New York. Mr. Ning fled to the United States as a result of the conduct alleged in this Complaint and fear of further reprisals from the Chinese communist regime.

8.      Defendant Oath Holdings, Inc. is a Verizon company. Oath Holdings, Inc., formerly known as Yahoo! Inc. and Yahoo! Holdings, Inc.—and successor in interest to the same—is a Delaware corporation that maintains its headquarters in Sunnyvale, California. Yahoo! Inc. sold its operating business, including those operations and liabilities at issue here, to Yahoo! Holdings, Inc. on June 13, 2017. Yahoo! Holdings Inc. then changed its name to Oath Holdings, Inc. on January 1, 2018. Pursuant to these transactions, and under applicable law, Defendant Oath Holdings, Inc. is liable for the damages alleged herein.

9.      Defendant Altaba, Inc., formerly known as Yahoo! Inc. and successor in interest to the same, is a Delaware corporation that maintains its primary offices in San Francisco, California, and New York, New York. After the transfer of Yahoo! Inc.'s operating business to Oath Holdings, Inc., Yahoo! Inc. changed its name to Altaba, Inc. On information and belief, Yahoo! Inc.—now Defendant Altaba, Inc.—retained liability for the damages alleged herein in its transactions with Oath Holdings, Inc. Pursuant to these transactions, and under applicable law, Defendant Altaba Inc. is also liable for the damages alleged herein.

10.      Defendant Jerry Yang founded Yahoo! Inc. and, during the relevant time period, controlled Yahoo! Inc. and its subsidiaries as owner, CEO, and in his self-described role of "Chief Yahoo." Yang resides in Los Altos Hills, Santa Clara County, California. Defendant Yang sought to secure the legacy and wealth that would result from Yahoo! Inc.'s—and its wholly-owned subsidiaries'—entry into the fledgling Chinese internet market. Prior to his guiding Yahoo!'s business into the Chinese market, Defendant Yang knew the Chinese government utilized a campaign of arbitrary arrest and torture to silence political dissenters. Defendant Yang knew that he could obtain personal wealth from his companies' activities in the Chinese market only if he committed the Yahoo! companies to helping the Chinese government silence political dissenters who used Yahoo! internet products to receive and disseminate pro-democracy, anti-communism

4

1   messages. Thus, Defendant Yang's desire to profit from the Chinese market and the People's

2   Republic of China's (**PRC**) desire to silence pro-democracy political speech led to a marriage of

3   ongoing repression fueled by the Yahoo! Defendants' secret ongoing cooperation with the Chinese

4   regime. This agreement went above and beyond ordinary business dealings and committed the

5   Yahoo! companies to knowingly assist in violating the human rights of Chinese freedom advocates

6   for Defendant Yang's personal profit. Without Defendant Yang's commitment to helping PRC

7   officials in their campaign of suppression and violence against political dissenters, Defendant Yang

8   and his Yahoo! companies would be excluded from the Chinese market and lose access to the

9   wealth produced from that market. Because Defendant Yang could not profit from the Chinese

10  market without helping the PRC arrest and torture dissidents, Defendant Yang agreed to help the

11  PRC's communist regime commit those grave harms. Defendant Yang made this Faustian bargain

12  knowing his profits would be earned at the expense of unsuspecting freedom advocates like Mr.

13  Ning.

14         11.     During much of the relevant time period, Defendant Terry Semel served as Yahoo!

15  Inc.'s CEO and chairman of Yahoo! Inc.'s board of directors. Semel resides in Woodland Hills, Los

16  Angeles County, California. Like Defendant Yang, Defendant Semel sought to secure the legacy

17  and wealth that would result from Yahoo! Inc.'s—and its wholly-owned subsidiaries'—entry into

18  the Chinese internet market. Defendant Semel knew prior to entering the market that the Chinese

19  government utilized arbitrary arrest and torture to silence political dissenters, and that he could

20  obtain personal wealth from the Chinese market only if he committed the Yahoo! companies to

21  helping the Chinese government in its campaign of censorship and torture. Thus, Defendant Semel's

22  desire to profit from the Chinese market and the PRC's desire to silence pro-democracy political

23  speech joined as unified intentions. This agreement went above and beyond ordinary business

24  dealings and committed the Yahoo! companies to assist in violating human rights for Defendant

25  Semel's personal profit. Without Defendant Semel's commitment to helping PRC officials commit

26  violence against political dissenters, Defendant Semel and his Yahoo! companies would be

27  excluded from the Chinese market and lose access to the wealth produced from that market.

28

Original Complaint and Jury Demand

1    Defendant Semel made the same Faustion bargain with the repressive Chinese regime knowing that

2    his profits would be earned at the expense of freedom advocates like Mr. Ning.

3          12.     Under the various agreements, bylaws, and norms governing Yahoo! Inc.'s corporate

4    governance and structure—and relevant law—Defendants Yang and Semel possessed broad

5    authority over Yahoo! Inc. and its wholly-owned subsidiaries in Hong Kong and China from their

6    positions in California. Under the various agreements, bylaws, and norms governing Yahoo! Inc.'s

7    relationships with its wholly-owned subsidiaries in Hong Kong and China, Yahoo! Inc. retained and

8    exercised vertical control of the day-to-day operations of those subsidiaries and those subsidiaries'

9    agents and employees from Yahoo! Inc.'s position in Sunnyvale, California. In other words, to any

10   extent Yahoo! Inc.'s subsidiaries carried out any misconduct supporting Mr. Ning's claims, those

11   subsidiaries acted pursuant to direct instructions from Yahoo! Inc., Yang, and Semel. Defendants

12   Yang and Semel exercised complete control over the sensitive relationship between the Yahoo!

13   Defendants and the Chinese regime. This control extended to the secret provision of confidential

14   information about Chinese freedom advocates from Yahoo!'s files and records to the Chinese

15   regime.

16         13.     Mr. Ning anticipates that, in an effort to avoid personal liability, the Yahoo!

17   Defendants will argue that employees and agents of Yahoo! Inc. and its wholly-owned subsidiaries

18   actually disclosed Mr. Ning's private information to the PRC communist regime. Notwithstanding

19   any such allegations or evidence supporting those allegations, the Yahoo! Defendants remain liable

20   under applicable agency and ratification principles.

21         14.     The authority possessed by the Yahoo! Defendants through the corporate governance

22   agreements in place within Yahoo! included without limitation authority to order the disclosure to

23   PRC officials Yahoo! customers' private email communications, names, addresses, user IDs, and

24   data showing their whereabouts when they accessed their Yahoo! accounts (**Protected**

25   **Information**). Defendants Yang and Semel, individually and as the chief decision-makers for

26   Yahoo! Inc., instructed Yahoo! Inc. employees and agents, Yahoo! Inc.'s subsidiaries in Hong

27   Kong and China, and the agents and employees of Yahoo! Inc.'s subsidiaries in Hong Kong and

28   China (collectively **Agents**) to comply with any request for information from PRC authorities

6

regarding a Chinese national in China. Alternatively, because Defendants Yang and Semel, individually and as the chief decision-makers for Yahoo! Inc., allowed their Agents to disclose Protected Information without objection—and encouraged such disclosures—those Agents reasonably believed they had authority to do so on behalf of Yahoo! Inc. and its subsidiaries.

15.     The Yahoo! Defendants thus instructed their Agents to disclose the Protected Information of Chinese political dissidents—including Mr. Ning—to PRC authorities upon request. The Yahoo! Defendants instructed their Agents to effect such disclosure without warning Mr. Ning or other Chinese Yahoo! customers that they would do so or had done so. Indeed, the Yahoo! Defendants instructed their Agents to conceal all information relating to such disclosures from Chinese Yahoo! customers, including Mr. Ning. The Agents carried out these instructions with respect to Mr. Ning's Protected Information as well the Protected Information of other political dissidents in China. The Yahoo! Defendants knew about their Agents' actions and approved them.

16.     Based on the Yahoo! Defendants' actual authority to issue these instructions, and according to those specific instructions, (1) Mr. Ning's Protected Information was disclosed to the PRC communist regime; (2) Mr. Ning was purposefully kept unaware that the Yahoo! Defendants or their Agents would disclose or had disclosed his Protected Information; and (3) Mr. Ning could not have detected the Yahoo! Defendants' role in his arrest, imprisonment, and torture until recently.

17.     Even if such individual disclosures were not expressly authorized by the Yahoo! Defendants, the Yahoo! Defendants ratified the policy which encouraged those disclosures, and the relevant Yahoo! Agents in China and Hong Kong reported directly to their counterparts in Yahoo! Inc.'s California headquarters. The Yahoo! Defendants faced public scrutiny regarding the disclosure of political dissidents' Protected Information to PRC officers because the PRC communist regime silenced those dissidents with torture, murder, and lengthy prison sentences. And each time the Yahoo! Defendants fielded criticism regarding these disclosures, they defended their own actions as well as the actions of Yahoo! subsidiaries, Agents, and employees in California and China who may have acted in connection with these disclosures. In essence, the Yahoo! Defendants defended the acts of their Agents by stating, "They were just doing their jobs." Thus, not only did

1  the Yahoo! Defendants fail to discourage such disclosures by their Agents, they openly justified

2  them while fully understanding the extent and consequences of those disclosures.

3

4                                     **JURISDICTION AND VENUE**

5          18.     This Court has subject matter jurisdiction because this is a civil action arising under

6  the laws of the United States. *See* 28 U.S.C. § 1331. Specifically, the Court may exercise federal

7  question jurisdiction over Plaintiff's claims under the Alien Tort Statute (**ATS**), 28 U.S.C. § 1350

8  and Torture Victim Protection Act (**TVPA**), 28 U.S.C. § 1350 note.

9          19.     This Court has subject matter jurisdiction because this is a civil action by an alien for

10 a tort committed in violation of the law of nations or a treaty of the United States. *See* 28 U.S.C. §

11 1350.

12         20.     This Court has subject matter jurisdiction because this is a civil action in which the

13 matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is

14 between citizens and legal residents of different states. 28 U.S.C. § 1332.

15         21.     This Court has supplemental subject matter jurisdiction over Mr. Ning's state law

16 claims under 28 U.S.C. § 1367. The Court has federal-question jurisdiction, and Plaintiff's state law

17 claims are so related to Plaintiff's federal law claims that they form part of the same case or

18 controversy.

19         22.     This Court may exercise personal jurisdiction over the Yahoo! Defendants under

20 California's long-arm statute, which is coextensive with federal constitutional due process limits.

21 *See* Cal. Civ. Proc. Code § 410.10. Defendants Yang and Semel reside in California, and

22 Defendants Oath Holdings, LLC and Altaba Inc. maintain a headquarters or primary office in

23 California. Moreover, as set forth herein, this action arises from and is related to all Defendants'

24 actions within the state of California.

25         23.     Venue is proper in this district because Defendant Yang resides here and because

26 Defendants Oath Holdings, LLC and Altaba Inc. maintain a headquarters or primary office within

27 the district. *See* 28 U.S.C. § 1391(b)(1), (c)(2), and (d).

28

Original Complaint and Jury Demand

24.     Further, venue is proper in the Northern District of California because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of California. From Sunnyvale, California, the Yahoo! Defendants formed an agreement and alliance with the Chinese communist regime, pursuant to which Yahoo! Inc. and its subsidiaries and Agents would help the Chinese communist regime identify pro-democracy dissidents who resided in China and used Yahoo! email and other internet services to support their pro-democracy movement. In furtherance of that agreement and alliance, and pursuant to Yahoo! Defendants' instructions, Yahoo! Inc. and its Agents and subsidiaries disclosed customers' private information and communications to Chinese authorities—without notifying customers of the disclosure. Among those communications disclosed by the Yahoo! Defendants were emails between Mr. Ning and a pro-democracy activist who sent and received those emails in San Francisco, California using a Yahoo! account. The Yahoo! Defendants carried out this misconduct in order to preserve the Yahoo! Defendants' profits from their Chinese operations by helping the Chinese government capture, imprison, and torture pro-democracy activists living in China. Mr. Ning's claims arise from and relate to these actions by the Yahoo! Defendants.

25.     This action should be assigned in accordance with Rule 3-2(c) and (e) of the Northern District of California Civil Local Rules. This case should be assigned to the San Jose division because one or more defendants reside in the division for venue purposes and a substantial part of the events or omissions which give rise to Mr. Ning's claims occurred in one or more of the counties identified in Local Rule 3-2(e).

## STATEMENT OF FACTS

26.     Mr. Ning is a citizen of the PRC and resides in the United States.

27.     PRC officials arbitrarily arrested, convicted, and imprisoned Mr. Ning for criticizing the Chinese Communist Party (**CCP**), for participating in pro-democracy activities, and for disseminating pro-democracy publications. In connection with his arrest and detention, Mr. Ning suffered permanent injuries and endured extreme physical and psychological torture, forced manual labor, the loss of his gainful employment, and the destruction of his family home.

28.     The Yahoo! Defendants actively helped the PRC's communist regime identify Mr. Ning and other Chinese Yahoo! customers as pro-democracy dissidents. In an effort to maximize profits from the 110 million internet users in the Chinese market, the Yahoo! Defendants entered a joint venture with the PRC, pursuant to which the Yahoo! Defendants agreed to help identify Chinese nationals who expressed pro-democracy, anti-CCP ideas over the internet. This agreement went beyond the ordinary business dealings needed for a company like Yahoo! Inc. to establish a foreign presence given, among other things, other internet companies entered the Chinese market without entering and honoring a similar agreement. With the benefit of effective, active assistance from the Yahoo! Defendants in California, the PRC arbitrarily arrested, imprisoned, and tortured numerous pro-democracy dissidents.

29.     Mr. Ning was a pro-democracy dissident targeted by the PRC and the Yahoo! Defendants. Mr. Ning was and remains a vocal pro-democracy advocate who privately and discretely disseminated pro-democracy, anti-communism messages and writings using his Yahoo! email account. The Yahoo! Defendants and PRC worked together to silence and punish Mr. Ning. Pursuant to their agreement and partnership with the PRC, the Yahoo! Defendants provided the PRC with Mr. Ning's (and others') private email records, copies of email messages, email addresses, user ID numbers, and other identifying information about Mr. Ning and his pro-democracy writings and communications. By this conduct, the Yahoo! Defendants knowingly and intentionally assisted the PRC in its arbitrary arrest, conviction, imprisonment, and torture of Mr. Ning. As a result of the Yahoo! Defendants' misconduct—and consistent with the Yahoo! Defendants' intent and goals of their partnership with the Chinese communist regime—Mr. Ning's pro-democracy messages were silenced, and Mr. Ning suffered permanent and irreversible physical, psychological, and economic injuries.

**I. MR. NING BRAVELY ADVOCATED FOR DEMOCRACY AND WORKERS' RIGHTS IN CHINA.**

30.     Mr. Ning's resistance against China's communist regime grew from his and his family's personal suffering. Mr. Ning and his four siblings grew up in Shenyang, and their family barely survived on his father's wages. Because his family lacked elevated status in China's communist regime, Mr. Ning's family—despite the hard work of his father—barely scraped by

Original Complaint and Jury Demand

1  financially and lived in squalor. Most other working-class families in Shenyang suffered through

2  similar circumstances for the same reason.

3      31.    As a seven-year-old boy, Mr. Ning first personally witnessed the darkness of

4  communism. A PRC communist officer came to Mr. Ning's family home and ordered Mr. Ning's

5  sister to provide manual labor on farms outside of Shenyang. For three years, she labored on local

6  farms—not allowed to visit home. Six years later, a PRC official similarly ripped Mr. Ning's

7  brother from the family home, forcing him to provide three years of unpaid labor on local farms. At

8  the time, communist propaganda often repeated the mantra, "If just one member of the family is

9  sent to the countryside for labor, the whole family gets the glory." Referring to that mantra, a

10  thirteen-year-old Mr. Ning told the officer taking his brother: "No, when one member of the family

11  goes to the countryside—like my sister and now my brother—everyone has *worry*, not glory." Two

12  years following that encounter, authorities ordered a third sibling, Mr. Ning's second sister, to

13  provide three years of unpaid manual labor.

14      32.    Witnessing the communist regime commit his siblings to slave labor and observing

15  his father's struggle to survive in a system that allowed only the communist elite to thrive, Mr.

16  Ning—as a child—developed disdain for communism. As an adult, he pushed back. Mr. Ning

17  devoted his life to reporting on the injustice perpetuated by the communist regime and advocating

18  for democracy in China.

19      33.    Mr. Ning began advocating for democracy and workers' rights as a young man in his

20  hometown of Shenyang. He organized a Shenyang City Citizens Support Group consisting of local

21  friends and neighbors who shared a disdain for the communist regime and sought to curb its abuses.

22  Because Mr. Ning's friends and neighbors trusted and respected him, they elected him chairman of

23  their newly-established Shenyang Patriotic Citizens Autonomous Union (**PCAU**). The PCAU

24  provided people of Shenyang a platform from which to challenge the CCP's oppressive labor

25  policies.

26      34.    In May 1989, Mr. Ning and his friends traveled from Shenyang to Beijing to join the

27  historic pro-democracy, pro-human rights protests at Tiananmen Square. Leaders of other anti-

28  communism unions from communities across China joined Mr. Ning at Tiananmen Square. Those

Original Complaint and Jury Demand

leaders formed the Beijing Autonomous Workers' Federation, a pro-democracy organization that courageously communicated their views to the CCP.

35.   Hundreds of thousands of protestors participated in the Tiananmen Square demonstrations. Even members of the military and law enforcement joined the protest against totalitarian control and in support of democracy. But the PRC communist regime, led by the CCP, eventually imposed martial law to quell the protests and remove the protesters. The military evacuated the protesters by firing on them and driving through and over them with armored vehicles. What began as a peaceful protest at Tiananmen Square ended in the murder of thousands of protesters by the communist regime.

36.   Up until this point, Mr. Ning had been open and vocal about his disdain for the policies of the PRC's communist regime. But after the PRC's violent response to and mass arrest of Tiananmen Square protesters, Mr. Ning began promoting democracy and working-class rights in a manner that could not be detected by the communist regime.

37.   Mr. Ning took every step he could to prevent the Chinese government from obtaining his confidential correspondence. In order to confidentially express his political opinions and avoid detection by the PRC, Mr. Ning sent and received pro-democracy communications using his Yahoo! email account. Mr. Ning kept his Yahoo! account secure with a password. He also encrypted the materials he sent from his Yahoo! account. Mr. Ning knew that the communist regime's discovery of his communications could result in arbitrary detention, arrest, imprisonment, and illegal torture by PRC officials. He thought that through Yahoo!'s services, he could fight for democracy while protecting his identity from PRC officials. Mr. Ning did not know that Defendants had agreed to provide and did provide the communist Chinese regime with his confidential communications and other Protected Information.

**II. PURSUANT TO THEIR AGREEMENT WITH THE PRC—AND IN ORDER TO MAXIMIZE PROFITS— THE YAHOO! DEFENDANTS HELPED CHINA'S COMMUNIST REGIME IDENTIFY AND CAPTURE MR. NING.**

38.   It has long been widely known that freedom advocates in China are subject to some of the most inhumane interrogation techniques and human rights abuses, including torture. It is well

1  known that PRC officials punish political dissidents for expressing pro-democracy ideas through

2  arbitrary arrest, brutal beatings, starvation, hard labor, and use of torture devices such as the "Tiger

3  Chair" or "Iron Chair." PRC officials often identify political dissidents through surveillance or

4  hacking measures. The Yahoo! Defendants' ongoing secret cooperation and agreement with the

5  Chinese communist regime greatly facilitated the regime's identification, detention, and repression

6  of Chinese pro-democracy freedom advocates.

7        39.    The Yahoo! Defendants knew of the PRC's human rights abuses before entering the

8  Chinese market. They nevertheless agreed to help the PRC communist regime capture and torture

9  political dissidents. Indeed, each of the Yahoo! Defendants received letters and had access to

10  publications—long before Mr. Ning's arrest—warning them that assisting the PRC communist

11  regime would result in the arbitrary arrest, imprisonment, and torture of innocent Chinese people

12  merely for exercising their right to free speech and assembly under Chinese and international law.

13  Those letters and publications came from non-governmental organizations including Human Rights

14  Watch and Amnesty International. The Yahoo! Defendants were well aware of the cost that came

15  with entering the Chinese market, but still chose to actively commit Yahoo! resources to supporting

16  the regime's suppression campaign.

17        40.    Yahoo! Inc. was the first major American internet company to enter the Chinese

18  market. The Yahoo! Defendants stood to gain billions of dollars in assets and business opportunities

19  by virtue of their Chinese operations. Prior to entering the Chinese market, the Yahoo! Defendants

20  knew that PRC communist officials falsely imprisoned and illegally tortured political dissidents.

21  Other American internet platforms either previously declined to enter the Chinese market or

22  withdrew from it due to its precarious human rights and cybersecurity environment. If Yahoo! Inc.,

23  Terry Semel, and Jerry Yang did not agree to help the PRC locate and imprison political dissidents

24  using Yahoo! internet products, the PRC would block the Yahoo! Defendants' access to the Chinese

25  market. The Yahoo! Defendants chose to take advantage of the scruples of their competitors to gain

26  a business advantage in the Chinese market by secretly agreeing to help the PRC identify political

27  dissidents active on Yahoo! internet platforms. The Yahoo! Defendants chose profits over principle

28  and morality in agreeing to facilitate the regime's campaign of repression.

Original Complaint and Jury Demand

41.     Defendants' decisions to provide the Chinese government confidential communications by pro-democracy activists like Mr. Ning were made and their implementation closely controlled and directed by Defendants Yang and Semel and the Yahoo managers they directed from Yahoo!'s California headquarters. The Yahoo! Defendants maintained vertical control over their Chinese subsidiaries throughout the relevant time period, such that responding to a request for information like the one in Mr. Ning's case would have been reviewed by the Yahoo! Defendants or their Agents.

42.     Thus, prior to entering the Chinese market, the Yahoo! Defendants—from Sunnyvale, California—agreed to help the PRC apprehend and torture Chinese pro-democracy dissidents in exchange for access to the Chinese internet market. And once Yahoo! entered the Chinese market, the Yahoo! Defendants fully performed their duties under that agreement. Through this agreement with the Yahoo! Defendants, the PRC's violent communist regime effectively had censorship enforcers operating in Sunnyvale, California. From their California headquarters, the Yahoo! Defendants ordered and oversaw the disclosure of Yahoo! customers' personal information to the PRC. That information included without limitation pro-democracy email exchanges between Mr. Ning and a resident of San Francisco, California, using a Yahoo! account. The Yahoo! Defendants did this as part of a joint effort to eliminate pro-democracy messages within China, leaving China, and entering China.

43.     The Yahoo! Defendants actively concealed their complicity with the PRC communist regime in their actions and omissions taken or directed from Yahoo!'s California headquarters, including concealing their activities from investors and the U.S. government. Although the Yahoo! Defendants have since publicly confessed to helping imprison some Chinese political dissidents, they have continued to conceal their assistance to the Chinese communist regime in imprisoning and torturing Mr. Ning.

44.     With respect to Mr. Ning, Yahoo! employees and Agents received a request from PRC authorities asking for private information relating to Mr. Ning's Yahoo! email account, including Protected Information such as Mr. Ning's identity, telephone number, physical address, private emails, and the dates, times, and IP addresses from which Mr. Ning accessed his Yahoo!

Original Complaint and Jury Demand

1   email account. The Yahoo! Defendants learned of the request at their California headquarters.

2   Defendants knew that the Chinese communist regime was seeking Mr. Ning's confidential

3   communications in order to detain, imprison, torture, and potentially execute him. Defendants knew

4   that Mr. Ning could be subject to the death penalty for the peaceful expression of dissenting views

5   and, yet, Defendants were willing to let Mr. Ning suffer these violations in order to maintain their

6   profits. Charges such as "subversion of state power" levied at Mr. Ning were transparent attempts to

7   mask the PRC's suppression of pro-democracy rhetoric by subjecting him to arbitrary arrest and

8   imprisonment, cruel and unusual punishment, outright torture, interrogation techniques outlawed by

9   international treaties, and forced labor.

10          45.    Knowing full well the abuse Mr. Ning and other political dissidents would endure if

11  the PRC possessed their private Yahoo! messages and information, the Yahoo! Defendants—from

12  Yahoo! Inc.'s California headquarters—ordered or approved the release of Mr. Ning's and other

13  dissidents' private and highly sensitive pro-democracy communications and other Protected

14  Information to PRC authorities. Mr. Ning's Protected Information, electronically stored on his

15  secure Yahoo! account, was provided to the PRC communist regime pursuant to the secret

16  agreement between the Yahoo! Defendants and the PRC formed at Yahoo!'s California

17  headquarters.

18          46.    The Yahoo! Defendants knew the PRC authorities would arbitrarily arrest and torture

19  Mr. Ning once they released his Protected Information to the government. They knew this because

20  the Yahoo! Defendants had turned over private emails of other pro-democracy dissidents in the past

21  to the PRC, and they knew that those dissidents had been arbitrarily arrested, convicted without

22  even knowing the evidence upon which their convictions relied, and tortured just as Mr. Ning would

23  be. The Yahoo! Defendants knew how valuable political dissidents' private information was, as

24  PRC officials would often use communications like Mr. Ning's to locate, arrest and imprison

25  dissidents. They knew that turning over this valuable information was their gateway into the

26  Chinese market. Thus, pursuant to their partnership and agreement with the PRC, and in an effort to

27  preserve their financial interest in the Chinese internet market, the Yahoo! Defendants continued to

28  assist the PRC in its efforts to punish pro-democracy dissidents.

15

Original Complaint and Jury Demand

1    47.    Enabled by the Yahoo! Defendants' illegal, unethical, and unscrupulous business

2    practices, the Chinese communist regime used Mr. Ning's Protected Information—including his

3    pro-democracy communications stored on his private Yahoo! email account—to arrest and torture

4    him.

5    **III.  MR. NING'S UNLAWFUL ARREST AND PRETRIAL TORTURE**

6    48.    After PRC communist authorities obtained Mr. Ning's private communications from

7    the Yahoo! Defendants, twelve armed PRC officers surrounded Mr. Ning at a restaurant in

8    Chengdu. PRC officers blindfolded and handcuffed Mr. Ning, and they shackled his legs. They

9    warned: "If you don't obey, we can kill you. We will shoot you to death if you attempt to run." Mr.

10   Ning's worst fears had come true, despite the abundance of precautions he had taken to protect his

11   identity.

12   49.    Soon after his arrest, PRC officers transferred Mr. Ning to a state security building in

13   his hometown of Shenyang. During the fifty-hour drive to Shenyang, PRC communist officers

14   deprived Mr. Ning of sleep, physically beat him about his face and limbs with batons and fists, and

15   repeatedly threatened to kill him. At no time during this trip was Mr. Ning anything other than

16   docile and compliant.

17   50.    After reaching Shenyang, Mr. Ning was placed in solitary confinement and put under

18   twenty-four-hour surveillance. The cell was round and padded to prevent suicide. Mr. Ning would

19   soon understand why political prisoners would want to die.

20   51.    Although PRC officers never disclosed the source of the information, they

21   interrogated Mr. Ning regarding the content of his Yahoo! email messages. Interrogations were

22   regularly conducted by teams of five to six individuals, all wearing a uniform bearing "1123." Mr.

23   Ning suspected that these numbers identified members of a notorious investigation team established

24   specifically to investigate and torture pro-democracy dissidents. Mr. Ning estimated that seventy

25   members of the 1123 investigation team participated in his interrogation. Each interrogation

26   generally lasted between four and six hours.

27   52.    Mr. Ning suffered through countless interrogations, during which he endured

28   barbaric, abusive interrogation techniques constituting torture. By way of example only, on one

16

1   representative occasion, PRC interrogators woke Mr. Ning in the middle of the night. They walked

2   Mr. Ning outside—when the temperature was less than negative 13° Fahrenheit—while Mr. Ning

3   wore only underwear, a thin shirt, and plastic slippers. These officers repeatedly punched Mr. Ning

4   in the head. Blindfolded, Mr. Ning could not see who was hitting him or where the strikes

5   originated. Mr. Ning cried out, "I am in a blindfold! I am shackled and handcuffed in this cold

6   weather, I am shivering, and you still beat me up! This is immoral." The officers continued to

7   threaten and punch Mr. Ning.

8        53.   The officers finally escorted Mr. Ning back inside to the interrogation room. As they

9   usually did before interrogating Mr. Ning, the team shackled Mr. Ning to the Tiger Chair, a high-

10  backed, spiked chair created for the sole purpose of torture-based interrogation that causes

11  increasingly greater discomfort to the back and buttocks as handcuffs and shackles are

12  intermittently tightened. Thus began one of many interrogation sessions based on the content of Mr.

13  Ning's Yahoo! email communications.

14       54.   While the Tiger Chair painfully contorted Mr. Ning's body, the main interrogator

15  asked, "Ning Xianhua, will you cooperate with this investigation?" Mr. Ning feared that if he

16  confessed, he may suffer more severe punishment. Mr. Ning therefore denied that he could

17  cooperate. In response, the chief interrogator shouted, "then hang him up!" Mr. Ning's handcuffs

18  were then loosened and reattached to the top of the Tiger Chair. The back of the Tiger Chair is

19  about one-and-a-half meters high, so the tips of Mr. Ning's feet could barely touch the ground once

20  handcuffed to the chair in this new position, thereby focusing extreme pressure on his wrists and

21  hands. The PRC investigator tightened the handcuffs as far as he could, so the handcuffs deeply cut

22  into the flesh of Mr. Ning's arm. Mr. Ning dripped with sweat and blood. As a result of this

23  interrogation session, Mr. Ning permanently lost function in his arms and hands and cannot even

24  maintain a grip on a cup of water.

25       55.   The questions in this interrogation, like many others, centered on Mr. Ning's

26  interactions and communications with overseas, pro-democracy activists through his Yahoo! email

27  account. Investigators directly referenced the contents of emails exchanged between Mr. Ning and a

28  pro-democracy activist who lived in San Francisco. The investigators informed Mr. Ning that they

Original Complaint and Jury Demand

1    already had sufficient evidence to convict him based on the content of his email communications.

2    The investigators nevertheless violently demanded that Mr. Ning confess that he had conspired to

3    subvert the reign of the CCP and had communicated with overseas dissidents in so doing.

4        56.    Mr. Ning's description of this portion of the interrogation reveals the level of pain

5    and suffering that he endured:

6        There were only two options for me at this point. One is begging for mercy. If I beg for

7        mercy, they may loosen my chains and take me down from hanging. Another option is I

8        could choose to commit suicide. I took notice that the interrogation table was about three

9        meters away, so I was attempting to swing on the chains to reach my head to the

10       interrogation table, so I could knock my head and die. I was full of pain, agony, anger, and

11       wrath. But three meters was just too far, so I was deliberately trying to move the Tiger Chair

12       closer to the interrogation table. The interrogators soon found my intention, so two officers

13       came in and used metal stakes to stabilize the chair, which would prevent me from

14       committing suicide. The officers said, "you want to die? We can kill you like an ant on the

15       ground. The only option is you obey and confess." So I told them, "in the past I could not

16       understand clearly why so many righteous people choose to commit suicide in detainment,

17       and today I finally realize and understand." When someone is tortured like this, their dignity

18       is trampled in such a way the only way he can defend his dignity is to choose to die. That

19       day was the most unforgettable day of my whole life because it was that day that I chose to

20       die rather than continue to experience extreme torture.

21       57.    Interrogations like the one described above occurred before Mr. Ning had even been

22   formally arrested or put on trial at the People's Court of Shenyang. These pre-arrest, pre-conviction

23   torture sessions marked only the beginning of Mr. Ning's suffering caused by the Yahoo!

24   Defendants' disclosure of his private information.

25   **IV. MR. NING SUFFERS YEARS IN PRISON AFTER A SHAM CRIMINAL TRIAL.**

26       58.    PRC officials submitted a memorandum to the Shenyang prosecutorial officials

27   advocating for Mr. Ning's prosecution based on evidence purportedly supporting Mr. Ning's

28   conviction. That memorandum revealed that Mr. Ning's prosecution and conviction relied on

Original Complaint and Jury Demand

1    information that the Yahoo! Defendants provided the PRC. Mr. Ning had used his Yahoo! email

2    account to communicate with pro-democracy activists overseas—including in the U.S.—and to

3    express his anti-communism, pro-democracy beliefs. The memorandum referenced pro-democracy

4    writings Mr. Ning circulated using his Yahoo! email account. One such writing obtained by the

5    PRC from Yahoo! Defendants and relied upon as a basis for Mr. Ning's prosecution was an essay

6    titled *The Envisions on Establishing Unions in Northeast China*. That essay proposed, among other

7    things, reinforcing the pro-worker movements in Liaoyang and Daqing, employing the active forces

8    to form a "fist" against the communist regime, expanding the pro-democracy movement from

9    Northeast China to all of China, and disseminating the concept of democracy among Chinese

10   workers. The prosecutorial memorandum also accused Mr. Ning of submitting and receiving

11   numerous other pro-democracy communications over the internet using his Yahoo! email account.

12   However, because the memorandum was confidential and not accessible by Mr. Ning or his defense

13   counsel—and in light of the Yahoo! Defendants' concealment of their involvement in Mr. Ning's

14   arrest and prosecution—Mr. Ning had no idea this document existed or that the Yahoo! Defendants

15   had helped to bring about his arrest, conviction, and torture.

16       59.    Nor was Mr. Ning afforded the right to confront his accusers or PRC witnesses. Mr.

17   Ning and his attorney knew that PRC authorities had relied on the substance of pro-democracy

18   messages related to communications he made with his Yahoo! email account, but he did not know

19   and could not have known that it was the Yahoo! Defendants who actually provided the evidence

20   supporting his conviction. Mr. Ning's understanding was that his Yahoo! communications were

21   secure, so he had no reason to suspect they had been deliberately provided to the PRC. Indeed, PRC

22   officials did not allow Mr. Ning to view the evidence against him.

23       60.    While awaiting a verdict in his criminal case, Mr. Ning endured over a month of

24   sleep deprivation, physical abuse, and starvation amounting to torture. Interrogation sessions like

25   the one described above continued while prosecutors weighed the evidence against him. Mr. Ning

26   never confessed to committing any crime, despite being interrogated with the Tiger Chair and

27   enduring physical beatings, starvation, sleep deprivation, and death threats by PRC officials.

28

Original Complaint and Jury Demand

61.     Once convicted, Mr. Ning was transferred to the Number One Detention Center in Shenyang, where he stayed for two years and four months. Each prisoner had a space approximately twelve inches wide for sleeping. Mr. Ning received a minimal amount of food—the bare minimum necessary to keep him alive. In the Number One Detention Center, Mr. Ning continued to experience abuse in the form of physical beatings and pain inflicted by handcuffs and shackles.

62.     This was one of the most psychologically challenging periods for Mr. Ning. Over one hundred death row prisoners were housed at the Number One Shenyang Detention Center while Mr. Ning was jailed there. Mr. Ning observed many of these prisoners being escorted to the "execution field" never to return to their cells. One of those prisoners was a purported "co-conspirator" of Mr. Ning's who was sentenced to death for his political speech. As he was escorted to the execution field, Mr. Ning could hear him shout, "Long live democracy!"

63.     Following his imprisonment at Number One Detention Center, Mr. Ning was transferred to the Dabei Prison in Shenyang. There, Chinese authorities forced Mr. Ning to provide unpaid manual labor for approximately ten hours per day. Mr. Ning produced Christmas decorations that were exported to North America and Europe. On days when Mr. Ning could not meet his assigned quota, the guards punished him with longer hours, physical beatings, or both. Mr. Ning lost count of how many times he was physically beaten as a result of missing his assigned quota. This cycle of forced labor and physical beatings persisted for at least two months. Mr. Ning was then transferred to Nanshan Prison in Jinzhou City, Liaoning Province, where he remained until his release.

64.     Importantly, Yahoo! Inc., Defendant Semel, and Defendant Yang knew that the PRC would subject Mr. Ning to these abuses if they turned over his private emails and other Protected Information to the communist regime. But they did it anyway to secure access to the lucrative Chinese market. Operating from Yahoo!'s California headquarters, the Yahoo! Defendants made a conscious decision to help the PRC arbitrarily arrest, unfairly imprison, and brutally torture Mr. Ning—and others—to preserve their business interests in China. Yahoo! Inc., Semel, and Yang stood to gain a significant amount of wealth from their operations in China. When the communist regime sought their help, the Yahoo! Defendants knowingly and willingly released Protected

Original Complaint and Jury Demand

1  Information and messages of pro-democracy dissidents—including Mr. Ning—to preserve their

2  profits and personal wealth. The money the Yahoo! Defendants made from their Chinese operations

3  depended on the human rights violations Yahoo! Defendants facilitated.

4  **V. THE YAHOO! DEFENDANTS' MISCONDUCT HAUNTED MR. NING AFTER HIS RELEASE FROM**

5  **PRISON.**

6       65.    After Mr. Ning completed his sentence and was released from prison, he was

7  arrested and detained again. Once more, Mr. Ning would suffer due to the Yahoo! Defendants'

8  actions. Because of Mr. Ning's prior conviction, PRC officials placed Mr. Ning on a heightened tier

9  of interrogation called the "Tiger Tier." The Tiger Tier involved enhanced physical abuse that

10 incorporated the Tiger Chair. Thus, PRC officers increased the intensity of the interrogation given

11 Mr. Ning's prior arrest and conviction based on his Yahoo! communications. During these violent

12 interrogations, which were similar to the session detailed above, authorities futilely demanded the

13 names of any co-conspirators who had attempted to subvert the reign of the CCP using online, pro-

14 democracy communications. Although once again subjected to the Tiger Chair and the abuse that

15 came with it, Mr. Ning warded off any thoughts of suicide, relying on the mettle he developed

16 during his previous torture.

17      66.    On top of inflicting severe physical abuse in an attempt to extract further confessions

18 from Mr. Ning, the PRC authorities destroyed Mr. Ning's ancestral home in Shenyang and

19 everything in it—the same house in which he first experienced the evils of communism. They also

20 destroyed his father's home out of retaliation. The destruction of Mr. Ning's family home resulted

21 from Mr. Ning's pro-democracy advocacy, occurred without warning, and left his mother and father

22 homeless. Mr. Ning lost his position as an executive vice president and partner at a legal services

23 company and was unable to find different employment after his release. PRC authorities also failed

24 to provide Mr. Ning with even the most basic health care. Mr. Ning is diabetic, and at no point in

25 his detention or prison sentence did he receive medication or accommodations for his condition.

26      67.    Left homeless, practically penniless, and in failing health, Mr. Ning was released on

27 bail and awaited trial. He lived in a state of fear—fear that was reasonable given that PRC officials

28 surveilled and stalked him.

Original Complaint and Jury Demand

1   **VI. MR. NING ESCAPED TO THE UNITED STATES AND FINALLY LEARNED OF THE YAHOO!**
2   **DEFENDANTS' INVOLVEMENT IN HIS ARREST, IMPRISONMENT, AND TORTURE.**

3   68.    Though Mr. Ning sought redress for his torture and imprisonment, he knew it would
4   be futile to attempt to seek justice in the fundamentally corrupt Chinese legal system. Had he sought
5   such redress or made any complaint, the communist regime would have imprisoned and tortured
6   Mr. Ning for subversion. Therefore, with the assistance of the U.S. Consulate General in Shenyang,
7   Mr. Ning fled to Thailand before the PRC could imprison him again. The U.S. Embassy in Thailand
8   assisted Mr. Ning in processing an asylum claim in the United States.

9   69.    Once Mr. Ning arrived in the United States, he was homeless and in failing health
10  because of the years of torture and abuse Defendants facilitated. He had lost his home, most of his
11  material possessions, and the financial security that came with his previous executive position at a
12  legal services company. Mr. Ning's failing health, combined with the fact that he does not speak
13  English, rendered Mr. Ning wholly dependent on others once he arrived in the United States. The
14  Yahoo! Defendants have always concealed and never disclosed that they provided PRC officials
15  with information that led to Mr. Ning's arbitrary arrest and conviction, inhumane torture, and
16  resulting permanent injuries. When the U.S. House of Representatives Foreign Affairs Committee
17  demanded that the Yahoo! Defendants supplement their previous statements regarding the pro-
18  democracy dissidents that they effectively turned over to the PRC, these Defendants continued to
19  conceal their actions with respect to Mr. Ning. The Yahoo! Defendants never supplemented their
20  testimony before U.S. House of Representatives Foreign Affairs Committee by identifying Mr.
21  Ning as a victim of their misconduct, and the Yahoo! Defendants have never publicly disclosed that
22  they secretly turned over Mr. Ning's Protected Information to PRC authorities as alleged in this
23  Complaint.

24  70.    As Mr. Ning slowly healed in the United States, he finally learned that the Yahoo!
25  Defendants were involved with his arrest, imprisonment, and torture. Even if Mr. Ning had learned
26  of the Yahoo! Defendants' misconduct while he remained in China, any efforts to obtain justice
27  would have been futile and dangerous for Mr. Ning and his family. In the years leading up to his
28  departure from China, Mr. Ning was either in prison or under constant surveillance and scrutiny by

PRC authorities. The Chinese communist regime would have imprisoned him immediately had he sought civil relief in China. The PRC communist regime systematically imprisons those who dare publicize or criticize the regime's practice of censoring speech and imprisoning political dissidents in blatant violation of international law. To challenge the PRC's restrictions of free speech in China would have endangered Mr. Ning's family and himself. The PRC communist regime systematically silenced political dissidents by any means necessary, including torture and cruel treatment, prolonged arbitrary detention, imprisoning and punishing dissidents' family members, destruction of their property, and the imposition of the death penalty for peaceful protest.

71.     Mr. Ning hopes that, through this lawsuit, the Yahoo! Defendants are finally made to answer for the torture and injuries befalling Mr. Ning as a result of their misconduct. He also hopes that the Yahoo! Defendants reveal the identity of other political dissidents that they helped imprison pursuant to their agreement with the PRC communist regime. So long as the victims of Yahoo! Defendants' misconduct remain unknown, they are not likely to receive the help they need.

## CLAIMS FOR RELIEF

**I. VIOLATIONS OF THE LAW OF NATIONS, 28 U.S.C. § 1350.**

72.     Mr. Ning incorporates all other paragraphs in this Complaint here as if fully restated.

73.     Because of the Yahoo! Defendants' actions alleged herein, Mr. Ning suffered torture and other forms of cruel, inhuman, and degrading treatment or punishment, crimes against humanity, and prolonged arbitrary arrest and detention (**Violations**). Each of the Yahoo! Defendants aided and abetted these Violations and conspired with the PRC communist regime to commit those Violations. These Violations were part of a widespread and systematic persecution of pro-democracy freedom advocates and any other Chinese citizen engaged in any criticism of the regime's policies or actions.

74.     Defendants Yang, Semel, and Yahoo! Inc. entered into an agreement with the PRC communist regime pursuant to which Yahoo! employees and Agents would provide Yahoo! customers' Protected Information and communications upon request by PRC officials without providing notice to those Yahoo! customers. Pursuant to Defendants' agreement with the PRC and their specific instructions issued from California, Yahoo! employees and Agents turned over Mr.

1   Ning's private email communications and other Protected Information stored on his Yahoo! account
2   to PRC authorities with the knowledge and intent that the PRC would silence Mr. Ning by
3   committing the Violations defined above.

4       75.    The Yahoo! Defendants entered the partnership and agreement with the PRC
5   communist regime in Sunnyvale, California. This agreement with the PRC exceeded Yahoo!
6   Defendants' ordinary business activities, forming a secret pact with a notoriously abusive foreign
7   government which Defendants knew would lead inescapably to exactly the kinds of human rights
8   violations suffered by Mr. Ning. Through that agreement, the PRC communist regime extended its
9   reach to Sunnyvale, California, from which the Yahoo! Defendants aided and abetted the silencing
10  of pro-democracy messages within China, leaving China, and entering China. Pursuant to this
11  agreement and active partnership—and pursuant to specific orders and directives by the Yahoo!
12  Defendants issued from California—Yahoo! and its Agents turned over the Protected Information
13  of Yahoo! customers like Mr. Ning to the PRC communist regime. The information produced by the
14  Yahoo! Defendants to PRC officials—and leading to Mr. Ning's imprisonment and torture—
15  included without limitation pro-democracy email exchanges between Mr. Ning in China and pro-
16  democracy activists in San Francisco, California. The Yahoo! Defendants controlled the
17  information belonging to their customers from California, and they specifically elected to turn it
18  over to the PRC communist regime to further their personal financial interests.

19  **II. TORTURE VICTIMS PROTECTION ACT, 28 U.S.C. § 1350 NOTE.**

20      76.    Mr. Ning incorporates all other paragraphs in this Complaint here as if fully restated.

21      77.    PRC authorities intentionally inflicted physical and mental pain on Mr. Ning with the
22  specific purposes of extracting a confession from him, obtaining information regarding other pro-
23  democracy political dissidents, intimidating Mr. Ning, and punishing Mr. Ning for his pro-
24  democracy communications and beliefs. PRC authorities starved Mr. Ning for days. They deprived
25  him of sleep for days at a time. They beat him continuously for hours and subjected him to the Tiger
26  Chair for multiple hours on numerous occasions. PRC officials regularly threatened to kill Mr. Ning
27  and expressed a ready willingness to snuff out his life, a threat made more real by Mr. Ning's
28  witnessing of other pro-democracy dissidents being led to the execution field. The initial request for

Original Complaint and Jury Demand

1    Mr. Ning's information and all of the horrific acts that followed were carried out under the color of

2    the PRC's legal authority.

3        78.     Defendants Yang and Semel knowingly aided and abetted the PRC's torture of Mr.

4    Ning through their control over the disclosure of Mr. Ning's confidential information and their

5    knowing disclosure of this information to the Chinese regime for the purposes of repressing pro-

6    democracy freedom advocates. Prior to their guiding Yahoo!'s business into the Chinese market,

7    Defendants Yang and Semel knew that the Chinese government employed torture to silence and

8    punish political dissenters and to extract information from them. Defendants Yang and Semel

9    nonetheless specifically instructed their companies' employees and Agents to provide Yahoo!

10    customers' private records and communications upon request by PRC officials, despite knowing

11    that providing this information would directly lead to state torture and execution of customers like

12    Mr. Ning. This premeditated collaboration with PRC officials constituted more than general

13    supervision of company affairs by Defendants Yang and Semel. Rather, pursuant to Defendants

14    Yang's and Semel's agreement with the PRC and their specific instructions issued from California

15    through the company's vertical structure, Yahoo! employees and Agents turned over Mr. Ning's

16    private email communications and other Protected Information stored on his Yahoo! account to

17    PRC authorities with the knowledge and intent that the PRC would torture Mr. Ning as alleged in

18    this Complaint. In doing so, Defendants acted under the color of foreign authority pursuant to their

19    secret agreement to facilitate the Chinese communist regime's systematic repression of pro-

20    democracy freedom advocates.

21    **III. Unfair & Unlawful Business Acts and Practices, California Business & Professions Code §§**

22    **17200, *et seq.***

23        79.     Mr. Ning incorporates all other paragraphs in this Complaint here as if fully restated.

24        80.     The Yahoo! Defendants' disclosure of Mr. Ning's private emails and other Protected

25    Information stored on his Yahoo! account violates California's Unfair Competition Law (**UCL**).

26    Cal. Bus. & Prof. Code § 17200, which broadly proscribes any business practice or act that is

27    unlawful, unfair, or fraudulent.

28

Original Complaint and Jury Demand

81.     In order to enter the Chinese market and maintain their financial advantage, the Yahoo! Defendants agreed to help the PRC apprehend Chinese pro-democracy dissidents by turning over the Protected Information of their consumers. This misconduct occurred in Sunnyvale, California, where Yahoo! Defendants ordered and oversaw the disclosure of Yahoo! customers' Protected Information to the PRC.

82.     Business & Professions Code § 17204 provides that an action for violation of California's unfair competition law may be brought by persons who have suffered injury in fact and have lost money or property as a result of such unfair competition, and Business & Professions Code § 17203 provides that a court may grant injunctive and equitable relief to such persons.

83.     Mr. Ning has suffered an injury in fact and has lost money and property as a result of Yahoo! Defendants' practices, including the loss of his ancestral home, job, and most of his possessions.

**Unlawful Practices**

84.     Yahoo! Defendants' business practices were unlawful insofar as they are actionable under the Alien Tort Statute, 28 U.S.C § 1350; the Torture Victims Protection Act, 28 U.S.C § 1350; and other statutory and common law.

85.     Yahoo! Defendants' conduct violated the spirit and letter of these laws, which protect property, economic and privacy interests and prohibit unauthorized disclosure and collection of private communications and personal information. By knowingly and intentionally accessing Mr. Ning's Protected Information, disclosing it to Chinese authorities without Mr. Ning's consent, and aiding and abetting the PRC's torture of Mr. Ning, Yahoo! Defendants integrated a multitude of illegal acts into their business practices.

86.     Plaintiff reserves the right to allege other violations of law that constitute unlawful business acts or practices based upon the above-described conduct.

87.     Plaintiff has suffered injury in fact and has lost money and property as a result of Defendant's unfair competition and is therefore entitled to injunctive relief including restitution under Business & Professions Code §§ 17200, *et seq.*

Original Complaint and Jury Demand

**Unfair Practices**

88.     Yahoo! Defendants' business practices were unfair because they gave the Yahoo! Defendants an illegal advantage in the Chinese market. Other internet platforms have been blocked from the Chinese market due to their refusal to censor or compromise their users' privacy and security, which left consumers in China with limited ways to communicate electronically. Yahoo! Defendants took advantage of other companies' reluctance to violate human rights and privacy laws in order to enter the Chinese market and preserve their financial advantage. They saw the value of dissidents' personal information and profited from it by turning over emails and other Protected Information to PRC officials. This was an unethical and oppressive business practice that resulted in substantial injury to Mr. Ning through the loss of his ancestral home, job, and most of his possessions, along with serious and lasting physical harm.

89.     Any justification for Yahoo! Defendants' conduct is outweighed by the gravity of the consequences to Plaintiff as alleged above. There were reasonable available alternatives for the Yahoo! Defendants to further their business interests such as refusing to disclose their users' Protected Information to the Chinese authorities and/or making their users aware of these unethical practices. Indeed, the burden and expense of not disclosing Plaintiff's information to the Chinese authorities and/or informing their users of their intentions would be minimal while the negative impact to Plaintiff was significant. Such actions taken by the Yahoo! Defendants is also contrary to public policy, immoral, unethical, oppressive, unscrupulous, and substantially injurious.

90.     Further, Yahoo! Defendants' conduct constitutes "unfair" business acts and practices because Yahoo! Defendants' practices were "likely to cause substantial injury" to Mr. Ning—and did in fact cause Mr. Ning substantial injuries. These injuries were not "reasonably avoidable" by Plaintiff, and the injuries are "not outweighed" by the practice's benefits to Mr. Ning.

91.     As a result of the Yahoo! Defendants' misconduct, Mr. Ning has suffered injury in fact and lost money and property and is therefore entitled to injunctive relief including restitution under Business and Professions Code §§ 17200, *et seq.*

**RELIEF SOUGHT**

92.     Mr. Ning seeks recovery of actual damages for the following:

27

Original Complaint and Jury Demand

A. Permanent loss of bodily function he sustained during the imprisonment and torture alleged herein;

B. Permanent disfigurement he sustained during the imprisonment and torture alleged herein;

C. Past and future medical expenses associated with treating Mr. Ning for injuries he sustained during the imprisonment and torture alleged herein;

D. Damages for lost income due to Mr. Ning's loss of employment and his decreased capacity to earn a living given his current state;

E. Reimbursement for the destruction of his home; and

F. Mental anguish and physical suffering Mr. Ning sustained during the imprisonment and torture alleged herein.

93.     Mr. Ning also seeks punitive damages because he sustained injuries as a result of misconduct by the Yahoo! Defendants that was knowing, intentional, malicious, reckless, or some combination thereof.

94.     Mr. Ning also seeks restitution and an order enjoining Defendants' unlawful and unfair practices, pursuant to California Business and Professions Code §17203.

95.     Mr. Ning seeks reasonable attorney's fees and costs he has incurred and will incur in prosecution of his claims against the Yahoo! Defendants.

## **PRAYER**

Plaintiff respectfully asks that the Court grant the relief requested above and all other relief to which Plaintiff is entitled, whether by law or equity.


*[Signature blocks on next page]*

Original Complaint and Jury Demand

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: September 2, 2020

 _/s/ Paul L. Hoffman_
Paul L. Hoffman (71244)
**SCHONBRUN SEPLOW
HARRIS
HOFFMAN & ZELDES LLP**
hoffpaul@aol.com
JOHN H. WASHINGTON
(315991)
jwashington@sshhzlaw.com
200 Pier Avenue, #226
Hermosa Beach, CA 90245
Tel: (310) 396-0731

**THE LANIER LAW FIRM, P.C.**
W. MARK LANIER, _Pending Pro
Hac Vice_
wml@lanierlawfirm.com
KENNETH W. STARR, _Pending
Pro Hac Vice_
ken.starr@lanierlawfirm.com
KEVIN P. PARKER, _Pending Pro
Hac Vice_
Kevin.parker@lanierlawfirm.com
BENJAMIN T. MAJOR, _Pending
Pro Hac Vice_
ben.major@lanierlawfirm.com
10940 W. Sam Houston Pkwy N,
Suite 100
Houston, Texas 77064
Tel:  713-659-5200

HELEN I. ZELDES (220051)
hzeldes@sshhzlaw.com
BEN TRAVIS (305641)
btravis@sshhzlaw.com
501 W. Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-4990

Original Complaint and Jury Demand

1

2
## DEMAND FOR JURY

3
        Plaintiff hereby demands a trial by jury on all issues as provided by Rule 38(b) of the

4
Federal Rules of Civil Procedure.

5
DATED: September 2, 2020

6
                                                          _/s/ Paul L. Hoffman_____
                                                          Paul L. Hoffman (71244)
                                                          **SCHONBRUN SEPLOW**
7                                                         **HARRIS**
                                                          **HOFFMAN & ZELDES LLP**
8                                                         hoffpaul@aol.com
                                                          JOHN H. WASHINGTON
9                                                         (315991)
                                                          jwashington@sshhzlaw.com
10                                                        200 Pier Avenue, #226
                                                          Hermosa Beach, CA 90245
                                                          Tel: (310) 396-0731

11                                                        **THE LANIER LAW FIRM, P.C.**
                                                          W. MARK LANIER, *Pending Pro*
12                                                        *Hac Vice*
                                                          wml@lanierlawfirm.com
13                                                        KENNETH W. STARR, *Pending*
                                                          *Pro Hac Vice*
14                                                        ken.starr@lanierlawfirm.com
                                                          KEVIN P. PARKER, *Pending Pro*
15                                                        *Hac Vice*
                                                          Kevin.parker@lanierlawfirm.com
16                                                        BENJAMIN T. MAJOR, *Pending*
                                                          *Pro Hac Vice*
17                                                        ben.major@lanierlawfirm.com
                                                          10940 W. Sam Houston Pkwy N,
18                                                        Suite 100
                                                          Houston, Texas 77064
19                                                        Tel:  713-659-5200

20
                                                          HELEN I. ZELDES (220051)
21                                                        hzeldes@sshhzlaw.com
                                                          BEN TRAVIS (305641)
22                                                        btravis@sshhzlaw.com
                                                          501 W. Broadway, Suite 800
23                                                        San Diego, CA 92101
                                                          Tel: (619) 400-4990

24

25

26

27

28

Original Complaint and Jury Demand