UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NING XIANHUA,<br><br>            Plaintiff,<br><br>      v.<br><br>OATH HOLDINGS, INC., et al.,<br><br>            Defendants. | Case No. 20-CV-06185-LHK<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 23 |

Plaintiff Ning Xianhua ("Plaintiff") sues Defendants Oath Holdings, Inc., Altaba, Inc., Terry Semel, Jerry Yang, and individuals whose identities are unknown to Plaintiff (collectively, "Defendants"). Before the Court is Defendants' motion to dismiss the instant case. ECF No. 23.[1] Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS Defendants' motion to dismiss with leave to amend.

## I. BACKGROUND

### A. Plaintiff's Alleged Pro-Democracy Activities in China

---

[1] Defendants' motion contains a notice of motion paginated separately from the memorandum of points and authorities in support of the motion. Civil Local Rule 7-2(b) provides that the notice of motion and points and authorities must be contained in one document with the same pagination.

1

Plaintiff Ning Xianhua is a Chinese national who resides in New York. ECF No. 1 ("Compl.") ¶ 7. Defendant Oath Holdings, Inc. ("Oath Holdings"), which was formerly known as Yahoo! Inc. and Yahoo! Holdings, Inc., is a Delaware corporation with its headquarters in Sunnyvale, California. *Id*. ¶ 8. Defendant Altaba, Inc. ("Altaba"), which was formerly known as Yahoo! Inc, is a Delaware corporation with its headquarters in San Francisco, California. *Id*. ¶ 9. Defendant Jerry Yang ("Yang") founded Yahoo! Inc. and controlled Yahoo! Inc and its subsidiaries during the time period relevant to the instant case. *Id*. ¶ 10. Terry Semel served as Yahoo! Inc's Chief Executive Officer and chairman of Yahoo! Inc's board of directors during the time period relevant to the instant case. *Id*. ¶ 11. The Court will refer to Yahoo! Inc. as "Yahoo."

Plaintiff is "a vocal pro-democracy advocate" who advocated for democracy in China. *Id*. ¶ 29. Plaintiff's "resistance against China's communist regime grew from his and his family's personal suffering." *Id*. ¶ 30. "Because [Plaintiff's] family lacked elevated status in China's communist regime, Plaintiff's family . . . barely scraped by financially." *Id*. Additionally, Plaintiff's brother and two sisters were allegedly taken by People's Republic of China ("PRC") officials to provide unpaid labor on local farms. *Id*. ¶ 31.

Plaintiff allegedly "began advocating for democracy and workers' rights as a young man in his hometown of Shenyang." *Id*. ¶¶ 32–33. In May 1989, Plaintiff participated in the "pro-democracy, pro-human rights protests at Tiananmen Square." *Id*. ¶ 34. The PRC regime, led by the Chinese Communist Party ("CCP"), responded to these protests by "impos[ing] martial law to quell the protests and remove the protesters" and by "firing on [protesters] and driving through and over them with armored vehicles." *Id*. ¶ 35.

Following the PRC's response to the Tiananmen Square protests, Plaintiff "began promoting democracy and working-class rights in a manner that could not be detected by the communist regime." *Id*. ¶ 36. Plaintiff "took every step he could to prevent the Chinese government from obtaining his confidential correspondence." *Id*. ¶ 37. "In order to confidentially express his political opinions and avoid detection by the PRC," Plaintiff "privately and discretely

2

disseminated pro-democracy, anti-communism messages and writings using his Yahoo! email account." *Id.* ¶¶ 29, 37. Plaintiff "kept his Yahoo! account secure with a password" and "encrypted the materials he sent from his Yahoo! account." *Id.* ¶ 37. Nevertheless, Plaintiff alleges that PRC officials were able to identify Plaintiff as a pro-democracy dissident through his Yahoo account. *Id.* ¶ 28.

### B. Yahoo's Alleged Disclosure of Plaintiff's Information to Chinese Authorities

Plaintiff alleges that PRC officials were able to identify him because Defendants "entered into a joint venture with the PRC, pursuant to which the Yahoo! Defendants agreed to help identify Chinese nationals who expressed pro-democracy, anti-CCP ideas over the internet." *Id.* Plaintiff alleges that, "[p]rior to entering the Chinese market, [Defendants] knew that PRC communist officials falsely imprisoned and illegally tortured political dissidents." *Id.* ¶¶ 39–40. However, Defendants assisted the PRC regime because, if Defendants "did not agree to help the PRC locate and imprison political dissidents using Yahoo! internet products, the PRC would block [Defendants'] access to the Chinese market." *Id.* ¶ 40. According to Plaintiff, "Defendants' decisions to provide the Chinese government confidential communications by pro-democracy activists like [Plaintiff] were made and their implementation closely controlled and directed by Defendants Yang and Semel and the Yahoo managers they directed from Yahoo!'s California headquarters." *Id.* ¶ 41.

Plaintiff alleges that "Yahoo! employees and Agents received a request from PRC authorities asking for private information relating to [Plaintiff's] Yahoo! email account, including Protected Information such as [Plaintiff's] identity, telephone number, physical address, private emails, and the dates, times, and IP addresses from which [Plaintiff] accessed his Yahoo! email account." *Id.* ¶ 44. Plaintiff alleges that Defendants "learned of the request at their California headquarters." *Id.* Plaintiff alleges that Defendants "knew that the Chinese communist regime was seeking [Plaintiff's] confidential communications in order to detain, imprison, torture, and potentially execute him." *Id.* ¶¶ 44, 46. Regardless, Defendants, from their California

3

headquarters, allegedly ordered or approved the release of Plaintiff's pro-democracy communications and protected information to PRC authorities. *Id.* ¶ 44.

### C. Plaintiff's Alleged Arrest and Torture

Plaintiff alleges that, as a result of Defendants' actions, Plaintiff was arrested, convicted, and imprisoned by the PRC for criticizing the CCP, for participating in pro-democracy activities, and for disseminating pro-democracy publications. *Id.* ¶ 27. According to Plaintiff, PRC officers arrested Plaintiff by blindfolding him, handcuffing him, and shackling his legs. *Id.* ¶ 48. Following Plaintiff's arrest, PRC officers "deprived [Plaintiff] of sleep, physically beat him about his face and limbs with batons and fists, and repeatedly threatened to kill him." *Id.* ¶ 49. Plaintiff was then put in solitary confinement and under 24 hour surveillance. *Id.* ¶ 50.

During his confinement, Plaintiff was interrogated regarding the content of his Yahoo email messages. *Id.* ¶ 51. Each interrogation lasted about four to six hours and involved torture. *Id.* For example, Plaintiff, who was wearing a thin shirt, underwear, and plastic slippers, was taken outside when the temperature was less than 13 degrees Fahrenheit, was blindfolded, and was beaten. *Id.* ¶ 52. Plaintiff was then placed in the Tiger Chair, a high-backed, spiked chair that contorts a person's body as their handcuffs and shackles are tightened. *Id.* ¶ 53. When Plaintiff refused to cooperate with the interrogators, the interrogators attached Plaintiff's handcuffs to the top of the Tiger Chair and then tightened Plaintiff's handcuffs so that they cut deep into his arms. *Id.* ¶ 54. "As a result of this interrogation session, [Plaintiff] permanently lost function in his arms and hands and cannot even maintain a grip on a cup of water." *Id.*

According to Plaintiff, Plaintiff was eventually convicted based on information that Defendants provided to PRC authorities. *Id.* ¶ 58. Plaintiff alleges that a memorandum submitted by PRC officials to prosecutorial officials and advocating for Plaintiff's prosecution included pro-democracy writings that Plaintiff had circulated and received using his Yahoo email account. *Id.* Plaintiff alleges that, "because the memorandum was confidential and not accessible by [Plaintiff] or his defense counsel —and in light of [Defendants'] concealment of their involvement in

[Plaintiff's] arrest and prosecution—[Plaintiff] had no idea this document existed or that [Defendants] had helped to bring about his arrest, conviction, and torture." *Id*. Plaintiff was also unable to confront his accusers. *Id*. ¶ 59. Accordingly, Plaintiff did not know that it was Defendants who had shared his communications with PRC authorities. *Id*.

While waiting for a verdict in his case, Plaintiff allegedly endured over a month of sleep deprivation, physical beatings, starvation, and interrogation sessions that involved torture. *Id*. ¶ 60. Once Plaintiff was convicted, he spent two years and four months in confinement, where he received a minimal amount of food and experienced physical abuse, including beatings. *Id*. ¶ 61. Plaintiff also witnessed other political dissidents being escorted to their execution and never to return. *Id*. ¶ 62. Plaintiff then was transferred to a labor camp, where he was physically beaten if he did not meet his work quota. *Id*. ¶ 63.

After Plaintiff was released, he was arrested and detained again. *Id*. ¶ 65. Because of his previous conviction, Plaintiff was allegedly put on a heightened tier of interrogation called the Tiger Tier, where he was subject to more intense interrogations involving the Tiger Chair. *Id*. PRC authorities also allegedly destroyed Plaintiff's ancestral home and everything in it because of Plaintiff's pro-democracy advocacy. *Id*. ¶ 66. Plaintiff also allegedly lost his job as an executive vice president and partner at a legal services company, and he was unable to find other employment. *Id*. Plaintiff was released on bail awaiting his trial. *Id*. ¶ 67.

"Though [Plaintiff] sought redress for his torture and imprisonment, he knew it would be futile to attempt to seek justice in the fundamentally corrupt Chinese legal system." *Id*. ¶ 68. "Had [Plaintiff] sought such redress or made any complaint, the communist regime would have imprisoned and tortured [Plaintiff] for subversion." *Id*. Accordingly, before he was imprisoned again, Plaintiff sought the assistance of the U.S. Consulate General and flew to Thailand, where the U.S Embassy assisted him in processing an asylum claim. *Id*. "Once [Plaintiff] arrived in the United States, he was homeless and in failing health because of the years of torture and abuse." *Id*. ¶ 69.

United States District Court
Northern District of California

According to Plaintiff, "Defendants actively concealed their complicity with the PRC communist regime . . . including concealing their activities from investors and the U.S. government." *Id*. ¶ 43. "Although [Defendants] have since publicly confessed to helping imprison some Chinese political dissidents, they have continued to conceal their assistance to the Chinese communist regime in imprisoning and torturing [Plaintiff]." *Id*. "When the U.S. House of Representatives Foreign Affairs Committee demanded that [Defendants] supplement their previous statements regarding the pro-democracy dissidents that they effectively turned over to the PRC, these Defendants continued to conceal their actions with respect to [Plaintiff]." *Id*. ¶ 69. Defendants "never supplemented their testimony before [the] U.S. House of Representatives Foreign Affairs Committee by identifying [Plaintiff] as a victim of their misconduct, and [Defendants] have never publicly disclosed that they secretly turned over [Plaintiff's] Protected Information to PRC authorities as alleged in this Complaint." *Id*.

According to Plaintiff, "[a]s [Plaintiff] slowly healed in the United States, he finally learned that [Defendants] were involved with his arrest, imprisonment, and torture." *Id*. ¶ 70. Plaintiff alleges that, even if he had learned of Defendants' misconduct while he was in China, he would not have been able to seek justice against Defendants because he would have been imprisoned immediately by PRC authorities. *Id*.

### D. Procedural History

On September 2, 2020, Plaintiff filed the instant case. Compl. Plaintiff alleges three causes of action: (1) violations of the Law of Nations under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350; (2) violation of the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note; and (3) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* Compl. ¶¶ 72–91.

On November 23, 2020, Defendants filed the instant motion, ECF No. 23 ("Mot."), and a request for judicial notice, ECF No. 24. On January 25, 2021, Plaintiff filed an opposition, ECF No. 27 ("Opp'n"), and a request for judicial notice, ECF No. 28. On February 22, 2021,

Defendants filed a reply. ECF No. 29 ("Reply").

The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Public records are proper subjects of judicial notice. *See, e.g.*, *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007). However, to the extent any facts in documents subject to judicial notice are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

In the instant case, Defendants request that the Court take judicial notice of four documents: (1) Yahoo! Inc.'s August 16, 2005 Form 8-K, which was filed with the U.S. Securities and Exchange Commission ("SEC") and is available on the SEC's website; (2) Yahoo! Inc's October 27, 2005 Form 8-K/A, which was filed with the SEC and is available on the SEC's website; (3) the Statement of Interest filed by the United States in *Doe v. Qi*, Case No. C-02-0672 CW, Dkt. No. 85 (N.D. Cal. Jan. 16, 2004); and (4) a fact sheet from the U.S. State Department titled "U.S. Relations with China," which is available on the U.S. State Department's website. ECF No. 24. Plaintiffs request that the Court take judicial notice of four documents: (1) the transcript of the November 6, 2007 Hearing Before the U.S. House of Representatives' Committee on Foreign Affairs Concerning Yahoo! Inc.'s Provision of False Information to Congress, which is available on the Committee's website; (2) U.S. Senate Report No. 102-249, which is available at 1991 WL 258662; (3) the U.S. State Department's 2019 Report on China, which is available on the U.S. State Department's website; and (4) an amicus brief filed in *Doe v. Nestle*, Case Nos. 19-416 and 19-453. ECF No. 28.

All of the foregoing documents are public records, which are proper subjects of judicial notice. *See Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) (taking judicial notice of excerpts from a Senate Report and noting that "[l]egislative history is properly a subject of judicial

United States District Court
Northern District of California

notice"); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (noting that SEC filings are proper subjects of judicial notice); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (noting that "court filings and other matters of public record" are proper subjects of judicial notice); *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069–70 (9th Cir. 1995) (taking judicial notice of U.S. State Department publications); *Lopez v. Bank of Am., N.A.*, --- F. Supp. 3d ---, 2020 WL 7136254, at *6 (N.D. Cal. Dec. 4, 2020) (noting that courts may generally take judicial notice of transcripts of congressional hearings and taking judicial notice of transcript of congressional hearing). Accordingly, the Court GRANTS Defendants' request for judicial notice and GRANTS Plaintiff's request for judicial notice.

## II. LEGAL STANDARD

### A. Motion to Dismiss Under Rule 12(b)(1)

A defendant may move to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Although lack of statutory standing requires dismissal for failure to state a claim under Rule 12(b)(6), lack of Article III standing requires dismissal for want of subject matter jurisdiction under Rule 12(b)(1). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "[I]n a factual attack," on the other hand, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. "In resolving a factual attack on jurisdiction," the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* The Court

8

"need not presume the truthfulness of the plaintiff's allegations" in deciding a factual attack. *Id.*

Once the defendant has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of establishing the Court's jurisdiction. *See Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

### B. Motion to Dismiss Under Rule 12(b)(6)

Rule 8(a) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to

United States District Court
Northern District of California

dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### C. Leave to Amend

If the Court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III. DISCUSSION

Defendants move to dismiss Plaintiff's Complaint on four grounds: (1) Plaintiff's Complaint fails to satisfy Federal Rule of Civil Procedure 8 and is barred by the statute of limitations; (2) Plaintiff's claims are not justiciable under the act of state doctrine, the political question doctrine, and the foreign affairs doctrine; (3) Plaintiff lacks Article III standing; and (4) each of Plaintiff's claims fails to state a claim. Mot. at 4–28.

Below, the Court first addresses Defendants' arguments that Plaintiff lacks Article III standing and that Plaintiff's claims are not justiciable under three different doctrines. The Court addresses these arguments first because the Court cannot rule on the merits without first addressing jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (holding that courts must first address jurisdiction before ruling on the merits); *Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 89–90 (1998) (concluding that the court erred

10

by ruling on the merits without addressing Article III standing). Both Article III standing and the political question doctrine implicate the Court's jurisdiction. *See Steel Co.*, 523 U.S. at 88 ("Petitioner . . . has raised the issue of respondent's standing to maintain the suit, and hence this Court's jurisdiction to entertain it."); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007) ("Because the political question doctrine curbs a court's power under Article III to hear a case, the doctrine is inherently jurisdictional."). Furthermore, although the Ninth Circuit has stated that the act of state doctrine and foreign affairs doctrine do not implicate the Court's jurisdiction,[2] the Court considers these justiciability arguments because they are related to Defendants' arguments regarding the political question doctrine. The Court concludes that Plaintiff has Article III standing and Plaintiff's claims are justiciable.

The Court then addresses Defendants' argument that the Complaint fails to satisfy Rule 8. Because the Court agrees with Defendants, the Court dismisses the Complaint with leave to amend without reaching Defendants' remaining grounds for dismissal.

### A. Article III Standing

Defendants contend that Plaintiff lacks Article III standing in the instant case. Mot. at 14–17. "To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008)). In the instant case, Defendants' argument focuses on the second element, traceability, which is also referred to as causation or causality. *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013).

"[A] court's obligation to take a plaintiff at its word at [the pleading] stage in connection

---

[2] The Ninth Circuit has stated that dismissals based on the act of state doctrine or the foreign affairs doctrine are rulings on the merits, not rulings on jurisdiction. *See Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) ("The act of state doctrine is not a jurisdictional limit on courts, but rather is 'a prudential doctrine designed to avoid judicial action in sensitive areas.'") (quotation omitted); *see also Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 959–960 (9th Cir. 2010) (reviewing dismissal under the foreign affairs doctrine as a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)).

United States District Court
Northern District of California

with Article III standing issues is primarily directed at the injury in fact and causation elements." *Levine v. Vilsack*, 587 F.3d 986, 996–97 (9th Cir. 2009). "To satisfy the causality element for Article III standing, Plaintiff[] must show that the injury is causally linked or 'fairly traceable' to [Defendants'] alleged misconduct, and not the result of misconduct of some third party not before the court." *Bellon*, 732 F.3d at 1141 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The line of causation between the defendant's action and the plaintiff's harm must be more than attenuated." *Id.* (quoting *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012)).

The United States Supreme Court has stated that Article III standing does not require that the defendant's actions be the last step in the chain of causation. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (explaining that courts should not equate "injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation"); *accord Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (concluding that, for purposes of Article III standing, plaintiffs need not "demonstrate that defendants' actions are the 'proximate cause' of plaintiffs' injuries). Although Article III standing does not exist where "the injury complained of is 'th[e] result [of] the *independent* action of some third party not before the court,' that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett*, 520 U.S. at 169 (citations omitted) (emphasis in original). "A causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Bellon*, 732 F.3d at 1141–42.

This Court and other courts in this district have found that the plaintiff's injury was fairly traceable to the defendant's alleged misconduct even where the defendant's alleged misconduct was not the last step in the causal chain. For example, this Court held that plaintiffs, victims of a data breach that affected Anthem, plausibly alleged the causation element of standing where they alleged that they were enrolled in a health plan administered by Anthem, they provided their personal information to Anthem, their personal information was compromised in a data breach,

United States District Court
Northern District of California

and their personal information was used by hackers. *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 987 (N.D. Cal. 2016). Similarly, this Court rejected Yahoo's arguments that plaintiffs, who were victims of a data breach that affected Yahoo email accounts, had not alleged the causation element of standing where the plaintiffs alleged that they used their Yahoo email accounts for their personal communications and finances, Yahoo failed to maintain appropriate data security measures, and hackers obtained the plaintiffs' personal information during data breaches. *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *17 (N.D. Cal. Aug. 30, 2017).

Additionally, in *Brill v. Chevron Corporation*, another court in this district found that an injury was fairly traceable to the defendant, Chevron, despite the fact that Chevron was not the last actor in the causal chain. 2017 WL 76894, at *1–*3 (N.D. Cal. Jan. 9, 2017). The plaintiffs, Israeli victims of terrorism, alleged that the "single most effective strategy in inciting" the terrorist attacks was former Iraqi leader Saddam Hussein's practice of providing significant rewards to terrorists' families. *Id*. at *3. The plaintiffs further alleged that Hussein was able, or at least had an increased ability, to make these payments because of "illegal surcharge payments made by companies like Chevron." *Id*. Although the plaintiffs alleged that, following Chevron's alleged misconduct, there were two other steps in the causal chain (Hussein's payment to the terrorists and the terrorists' perpetration of the attacks), the court nevertheless concluded that the plaintiffs' injury was fairly traceable to Chevron's alleged misconduct. *Id*.

In the instant case, Plaintiff alleges that he was arbitrarily imprisoned and tortured by PRC authorities because Defendants shared Plaintiff's pro-democracy communications, which were sent and received using his Yahoo account, with PRC authorities. Compl. ¶¶ 44, 46. Specifically, Plaintiff alleges that, when PRC authorities interrogated Plaintiff, they asked him about the communications he sent or received using his Yahoo account. *Id*. ¶ 51. Moreover, Plaintiff alleges that a memorandum submitted by PRC officials to prosecutorial officials and advocating for Plaintiff's prosecution included pro-democracy writings that Plaintiff had circulated and received

using his Yahoo email account. *Id.* ¶ 58. Furthermore, Plaintiff alleges that he kept his Yahoo account information confidential and does not mention any other way that PRC authorities would have gained access to his communications other than Defendants sharing Plaintiffs' communications. *Id.* ¶ 37.

Based on these allegations, Plaintiff has plausibly alleged that his arbitrary arrest and torture by PRC authorities was the result of Defendants' alleged disclosure of Plaintiff's Yahoo communications. *See Bennett*, 520 U.S. at 169 (stating that Article III standing exists where plaintiff's injury was "produced by determinative . . . effect upon the action of someone else") (citations omitted) (emphasis in original). Although Defendants' alleged disclosure was followed by additional steps in the causal chain (specifically, PRC officials' alleged arbitrary arrest and torture of Plaintiff), that does not preclude the conclusion that Plaintiff's injuries are fairly traceable to Defendants' alleged misconduct. *Bennett*, 520 U.S. at 168–69. Indeed, Plaintiff's causal chain is even stronger than the causal chain at issue in *Brill*, which involved two groups of actors (Hussein and the terrorists who perpetrated the attacks), not one (PRC authorities). Accordingly, the Court concludes that Plaintiff's injuries are fairly traceable to Defendants' alleged misconduct. Thus, the Court holds that Plaintiff has Article III standing in the instant case.

**B. Justiciability**

Defendants contend that Plaintiff's claims are not justiciable under three doctrines: (1) the political question doctrine; (2) the act of state doctrine; and (3) the foreign affairs doctrine. Mot. at 6–14. The Court addresses each doctrine in turn.

**1. Political Question Doctrine**

Defendants next assert that the instant case is not justiciable under the political question doctrine. Mot. at 12–14. A "political question" is one which is "outside the courts' competence and therefore beyond the courts' jurisdiction." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019). "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). Where a case "presents a political question,

14

[the court] lack[s] subject matter jurisdiction to decide that question." *Corrie*, 503 F.3d at 982.

Under the United States Supreme Court's decision in *Baker v. Carr*, the political question doctrine applies if one or more of six factors are "inextricabl[y]" involved in the case. *Baker*, 369 U.S. at 217. The *Baker* factors include: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; (2) "a lack of judicially discoverable and manageable standards for resolving it"; (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id*. The Court concludes that none of the *Baker* factors are present in the instant case.

As to the first *Baker* factor, the issue in the instant case is not textually committed to a coordinate political department. Defendants contend that the instant case involves "[t]he conduct of the foreign relations of our government," which "is committed by the Constitution to the executive and legislative branches." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). Courts proceed from "the understanding that the management of foreign affairs predominantly falls within the sphere of the political branches and the courts consistently defer to those branches." *Alperin v. Vatican Bank*, 410 F.3d 532, 549 (9th Cir. 2005). However, "[n]ot every case 'touching foreign relations' is nonjusticiable, and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive considerations in the context of human rights." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (citations omitted). The political question inquiry "is a case-by-case inquiry because it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Vatican Bank*, 410 F.3d at 549.

In the instant case, Plaintiff alleges that he was arbitrarily imprisoned and tortured in violation of the ATS and the TVPA. Courts have recognized that cases brought under the ATS,

15

like the instant case, may be constitutionally committed to the judiciary. *See Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 756 (9th Cir. 2011) (en banc) (recognizing that "Congress expressly enacted the ATS to provide a forum for resolution of tort claims"), *vacated on other grounds*, 133 S. Ct. 1995 (2013);[3] *see also Kadic*, 70 F.3d at 249 ("The department to whom this issue has been 'constitutionally committed' is none other than our own—the Judiciary."). Furthermore, the Ninth Circuit has stated that a case would not call upon the courts to judge the conduct of foreign relations where another branch of the United States government was not directly or indirectly involved in the events that occurred in the case. *See Sarei*, 671 F.3d at 756 (concluding that courts were not called upon to judge the conduct of foreign relations because "[t]he United States was not directly or indirectly involved in any of the events that occurred" in the instant case); *cf. Corrie*, 503 F.3d at 982 (concluding that a case was constitutionally committed to another branch where the executive branch financed the conduct that the plaintiffs sought to challenge). The same is true in the instant case. Accordingly, the first *Baker* factor is not present in the instant case.

As to the second *Baker* factor, there are judicially discoverable and manageable standards for resolving the instant case. "[U]niversally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating suits brought under the Alien Tort Act." *Kadic*, 70 F.3d at 249. Furthermore, the fact that the Court must look to international law does not create a political question. *Sarei*, 671 F.3d at 756. The instant case was brought under the ATS and TVPA, which provide judicially discoverable and manageable standards for resolving the instant case. Defendants do not contend otherwise. Thus, the second *Baker* factor is not present in the instant case.

---

[3] The Ninth Circuit's en banc decision in *Sarei* was vacated based on the United States Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.* 133 S. Ct. 1995 (2013). *Kiobel* held that the ATS does not apply to violations of the law of Nations that do not "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against [the ATS's] extraterritorial application." 569 U.S. 108, 124–25 (2013). In the instant motion, Defendants contend that Plaintiff's allegations do not overcome the presumption against extraterritoriality. Mot. at 20–22. The Court need not reach extraterritoriality because the Court dismisses Plaintiff's Complaint for failure to satisfy Federal Rule of Civil Procedure 8.

16

As to the third *Baker* factor, the existence of judicially discoverable and manageable standards "obviates any need to make initial policy decisions of the kind normally reserved for nonjudicial discretion." *Kadic*, 70 F.3d at 249. Accordingly, the third *Baker* factor is not present in the instant case.

As to the fourth through sixth *Baker* factors, the Ninth Circuit has stated that these factors "are more discrete in theory than in practice, with the analyses often collapsing into one another." *Vatican Bank*, 410 F.3d at 544. "The fourth, fifth, and sixth Baker factors are relevant in an ATS case 'if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Sarei*, 671 F.3d at 756 (quoting *Kadic*, 70 F.3d at 249). Where, as here, the facts of the case "present no question regarding the actual conduct of United States foreign policy, if there is any lack of respect due coordinate branches it must concern the executive's foreign policy interests related to this case." *Id.* "In asking whether adjudication of this matter would display a lack of respect for coordinate branches, [the Court] must ask whether another branch has taken any action that could be jeopardized by [the Court's] exercise of jurisdiction over this case." *Id.*

In the instant case, Defendants contend generally that judicial resolution of the instant case would "improperly insert the judiciary into a sensitive area already covered by the Executive Branch." Mot. at 13. However, Defendants do not point to any prior actions taken by a political branch that could be jeopardized by the Court's exercise of jurisdiction in the instant case. *See Sarei*, 671 F.3d at 756 (concluding that the fourth through sixth *Baker* factors are not present where another branch has not "taken any action that could be jeopardized by [the court's] exercise of jurisdiction over this case"). For example, where the Ninth Circuit has concluded that a case presented a nonjusticiable political question, the executive branch funded the challenged or same conduct. *See Corrie*, 503 F.3d at 983–84 (concluding that a case presented a nonjusticiable political question where the executive branch funded the conduct that the plaintiffs sought to

United States District Court
Northern District of California

challenge); *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 555 (9th Cir. 2014) (concluding that the fourth through sixth factors were implicated where plaintiffs challenged a private actor's funding of conduct and the executive branch funded the same conduct simultaneously). Defendants do not cite to any such executive branch funding or to any political branch's actions that could be jeopardized by the Court's exercise of jurisdiction in the instant case. Accordingly, the fourth through sixth *Baker* factors are not present in the instant case.

Because none of the six *Baker* factors are present in the instant case, the Court concludes that the political question doctrine does not bar judicial resolution of the instant case. Indeed, courts have concluded that other similar cases brought under the ATS based on alleged human rights violations do not present nonjusticiable political questions. *See Sarei*, 671 F.3d at 755–57 (concluding that a case brought under the ATS by residents of Papua New Guinea alleging that they or their family members were victims of international law violations in connection with the operation of a copper mine did not present a nonjusticiable political question); *see also Kadic*, 70 F.3d at 949 (concluding that a lawsuit involving genocide, war crimes, and crimes against humanity carried out by military forces did not present a nonjusticiable political question). Accordingly, the Court concludes that the instant case does not present a nonjusticiable political question.

## 2. Act of State Doctrine

Defendants first contend that the instant case is not justiciable under the act of state doctrine. Mot. at 6–12. "The act of state doctrine limits judicial interference in foreign relations by precluding adjudication of the sovereign acts of other nations in United States courts." *Royal Wulff Ventures LLC v. Primero Mining Corp.*, 938 F.3d 1085, 1088 (9th Cir. 2019). The doctrine is "a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id.* at 1092 (quoting *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990)).

18

For the act of state doctrine to apply, two mandatory elements must be met. *Id.* "[E]ven when [these] two mandatory elements are satisfied, courts may appropriately look to additional factors [*i.e.*, the policies underlying the act of state doctrine] to determine whether application of the act of state doctrine is justified." *Id.* (quoting *Sea Breeze Salt*, 899 U.S. at 1072–73). The Court initially addresses whether the mandatory elements are met in the instant case. The Court then considers the additional factors.

### a. Mandatory Elements

For the act of state doctrine to apply, two mandatory elements must be met: "(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act." *Id.* (quoting *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th Cir. 2018)).

As to the first element, courts have held that an act that violates *jus cogens* is not an official act under the act of state doctrine. "[A] *jus cogens* norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of *states* as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679). "*[J]us cogens* 'embraces customary laws considered binding on all nations,' and 'is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations.'" *Id.* at 715 (citation omitted). "Whereas customary international law derives solely from the consent of states, the fundamental and universal norms constituting jus cogens transcend such consent . . . .'" *Id.*

Courts have held that an act that violates *jus cogens* is not an official act under the act of state doctrine. *See, e.g.*, *Sarei*, 671 F.3d at 759 ("[V]iolations of *jus cogens* norms are not barred

United States District Court
Northern District of California

by the act of state doctrine because [they] are not sovereign acts"); *Siderman de Blake*, 965 F.2d at 718 ("International law does not recognize an act that violates *jus cogens* as a sovereign act."); *see also Kadic*, 70 F.3d at 250 ("[W]e think it would be a rare case in which the act of state doctrine precluded suit under section 1350.").

Defendants contend that the Complaint requires that the Court opine on the validity of several official acts by the PRC: the passage of laws banning dissident speech and requiring companies doing business in the PRC to cooperate in criminal investigations, the alleged request for Plaintiff's information from Defendants, and the apprehension and punishment of Plaintiff for violating these laws. Reply at 15. The Court initially considers the apprehension and punishment of Plaintiff. The Court then considers the passage of laws banning dissident speech and requiring cooperation in criminal investigation and the alleged request for Plaintiff's information.

First, as to the PRC's apprehension and punishment of Plaintiff, Plaintiff alleges that PRC authorities arbitrarily imprisoned and tortured him. Compl. ¶¶ 48–67. However, the alleged arbitrary imprisonment and torture of Plaintiff is not an official act because the alleged arbitrary imprisonment and torture of Plaintiff violated *jus cogens* norms. *Siderman de Blake*, 965 F.2d at 714–15 (holding that official torture was a violation of *jus cogens* norms); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1296 (N.D. Cal. 2004) ("It is well established that torture constitutes *jus cogens* violations"). Jus cogen violations are not official acts. *See Sarei*, 671 F.3d at 759 ("[V]iolations of *jus cogens* norms are not barred by the act of state doctrine because [they] are not sovereign acts"); *Siderman de Blake*, 965 F.2d at 718 ("International law does not recognize an act that violates *jus cogens* as a sovereign act.").

Second, as to the laws and the alleged request for Plaintiff's information, Plaintiff alleges that Defendants disclosed Plaintiff's pro-democracy communications to PRC authorities based on a request by PRC authorities. Compl. ¶ 41. Furthermore, Defendants contend that they were required to respond to any request by PRC authorities based on PRC law, which required them to cooperate in criminal investigations. Mot. at 6–9; Feinerman Decl. ¶ 12. In the antitrust context, he

United States District Court
Northern District of California

Ninth Circuit has held that "corporate conduct which is compelled by a foreign sovereign is also protected by antitrust liability, as if it were an act of the state itself." *Timberlane Lumber Co. v. Bank of America, N.T. and S.A.*, 549 F.2d 597, 606 (9th Cir. 1976). Under this principle, if Defendants' conduct was compelled by the request of the PRC, the act of state doctrine would apply. Moreover, Plaintiff alleges that Defendants aided and abetted PRC authorities' violations of Plaintiff's human rights. Compl. ¶¶ 73, 78. The Ninth Circuit has concluded that an act of state issue can arise in such circumstances. *See Doe I v. Unocal Corp.*, 395 F.3d 932, 960 (9th Cir. 2002) ("In the present case, an act of state issue arises because the court must decide that the conduct by the Myanmar Military violated international law in order to hold Unocal liable for aiding and abetting that conduct."), *on reh'g en banc dism'd by stipulation of the parties sub nom.*, 403 F.3d 708 (9th Cir. 2005). Accordingly, the Court concludes that the mandatory elements are present in the instant case and proceeds to consider the additional factors.

### b. Additional Factors

In *Banco Nacional de Cuba v. Sabbatino*, the United States Supreme Court outlined three factors to consider to ensure that application of the act of state doctrine "reflect[s] the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." 376 U.S. at 427–28. First, "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it." *Id*. at 428. Second, "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches." *Id*.; *accord Von Saher*, 754 F.3d at 725 ("The justification for invoking the act of state doctrine 'depends greatly on the importance of the issue's implications for our foreign policy.'") (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1047 (9th Cir. 1983)).

Third, "[t]he balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence." *Id*. The Ninth Circuit has also held that the court should consider whether the foreign state was acting in the public interest.

*Liu*, 892 F.2d at 1434. The Court applies a "balancing approach" to these factors. *W.S. Kirkpatrick*, 493 U.S. at 409.

As to the first *Sabbatino* factor, there is a high degree of consensus concerning the areas of international law implicated here. Indeed, as explained above, *supra* Section III(B)(2)(a), Plaintiff alleges violations of *jus cogens* norms, which are built upon international consensus. *See Siderman de Blake*, 965 F.2d at 714–15 (holding that official torture was a violation of *jus cogens* norms). Qi, 349 F. Supp. 2d at 1296 (concluding that, where violations of jus cogens norms were at issue, the first *Sabbatino* factor weighed against dismissal). Moreover, Plaintiff alleges violations of the ATS and the TVPA, and the Ninth Circuit has noted that the act of state doctrine would likely not preclude suit under these statutes. *See Kadic*, 70 F.3d at 250 ("[W]e think it would be a rare case in which the act of state doctrine precluded suit under section 1350."). Thus, the first *Sabbatino* factor weighs against dismissal.

As to the second *Sabbatino* factor, the Court does not conclude that the issue raised in the instant case will have important implications for United States foreign relations. As explained above, *supra* Section III(B)(1), Defendants have not pointed to any specific foreign policy decisions with which judicial resolution of the instant case would conflict. Moreover, unlike in other cases where the act of state doctrine precluded suit, Plaintiff is not seeking to hold PRC officials responsible for his arbitrary arrest and torture; rather, Plaintiff is seeking to hold Defendants, who are private actors, responsible for their actions in the United States. *Cf. Qi*, 349 F. Supp. 2d at 1301 (concluding that the second Sabbatino factor weighed in favor of dismissal of the plaintiffs' claims for monetary damages against PRC officials). Thus, the second *Sabbatino* factor weighs against dismissal.

As to the third *Sabbatino* factor, the PRC government, which was in power during all times relevant to the instant case, remains in power today. Thus, the third *Sabbatino* factor weighs in favor of dismissal.

As to the final factor, the Court concludes that Plaintiff has plausibly alleged that the PRC

22

government was not acting in the public interest. Indeed, Plaintiff alleges that PRC authorities arbitrarily arrested and tortured him, acts which would not be in the public interest. *See Unocal Corp.*, 395 F.3d at 960 (concluding that "it would be difficult to contend that the Myanmar Military and Myanmar Oil's alleged violations of international human rights were 'in the public interest'"); *Qi*, 349 F. Supp. 2d at 1306 (concluding that "torture, cruel, inhuman or degrading treatment and arbitrary detentions" were not in the public interest, such that this factor weighed against dismissal). Thus, the final factor weighs against dismissal.

The Court concludes that the first, second, and fourth factors weigh against dismissal, and the third factor weighs in favor of dismissal. Weighing these factors, the Court concludes that dismissing the instant case would not "reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Sabbatino*, 376 U.S. at 427–28; *see Unocal Corp.*, 395 F.3d at 960 (declining to apply the act of state doctrine where only the third factor weighed in favor of dismissal). Indeed, the instant case involves alleged arbitrary arrest and torture, which there is international consensus on and which is not in the public interest. Moreover, Defendants have not specifically articulated how proceeding in the instant case would affect foreign relations. Furthermore, although the PRC government remains in power, Plaintiff has brought the instant case not against the PRC or its officials but rather against Defendants, who are private actors. Thus, the Court concludes that the act of state doctrine does not bar the resolution of the instant case.

### 3. Foreign Affairs Doctrine

Defendants additionally contend that Plaintiff's UCL claim is not justiciable under the foreign affairs doctrine. Mot. at 14. The foreign affairs doctrine is a preemption doctrine that prevents "an intrusion by [a] State into the field of foreign affairs which the Constitution entrusts to the President and Congress." *Zschernig v. Miller*, 389 U.S. 429, 432 (1968); *accord Deutsch v. Turner Corp.*, 324 F.3d 692, 714 (9th Cir. 2003) (holding that, "[i]n the absence" of specific authorization from the federal government, "states are prohibited from exercising foreign affairs

23

powers").

The foreign affairs doctrine stems from the principle that "the federal government holds the exclusive authority to administer foreign affairs." *Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016). "Under the foreign affairs doctrine, state laws that intrude on this exclusively federal power are preempted, under either the doctrine of conflict preemption or the doctrine of field preemption." *Id*. "Under the doctrine of conflict preemption, a state action must yield to federal executive authority where 'there is evidence of clear conflict between the policies adopted by the two.'" *Id*. at 1228–29. (*quoting Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2005)). "Under the doctrine of field preemption, even in the absence of any express federal policy, a state action may be preempted where (1) its "real purpose" does not concern an area of traditional state responsibility, and (2) it intrudes on the federal government's foreign affairs power." *Id*. at 1229. Courts consider "the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." *Garamendi*, 539 U.S. at 420. Accordingly, the Court considers the following issues: (1) whether there is a likelihood that the UCL will conflict with U.S. foreign policy; (2) whether the UCL addresses a traditional state responsibility, and (3) the strength of the state interest.

First, Defendants have not shown a likelihood that the application of the UCL in the instant case "will produce something more than incidental effect in conflict with express foreign policy of the National Government." *Garamendi*, 539 U.S. at 419–20. "To intrude on the federal government's foreign affairs power, a [state's action] must have more than some incidental or indirect effect on foreign affairs." *See Gingery*, 831 F.3d at 1230 (quoting *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613, 617 (9th Cir. 2013) (citation omitted)). As explained above, *supra* Section III(B)(1)–(2), Defendants have not pointed to a specific policy with which the Court's adjudication of the instant case would conflict. Accordingly, Defendants have not shown that the application of the UCL would produce more than an incidental or indirect effect on

foreign affairs. *See Gingery*, 831 F.3d at 1230–31 (concluding that the foreign affairs doctrine did not apply where the plaintiffs did not make "specific allegations that [the local government's] actions have had, or are likely to have, any appreciable effect on foreign affairs").

Second, the UCL addresses a traditional state responsibility. Specifically, the UCL's main purpose is the "preservation of fair business competition." *See Cel-Tech. Commc'ns Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The preservation of fair business competition is a traditional state responsibility, which states have long regulated. *See Gingery*, 831 F.3d at 1230 (concluding that the construction of a monument fell within a traditional state responsibility because "[g]overnments have long used monuments to speak to the public") (quotation omitted). Moreover, Defendants have not contended that the "real purpose" of the UCL is to regulate foreign affairs. *Cf. Von Saher*, 592 F.3d at 964 ("Though [the state statute] purports to regulate property, an area traditionally left to the states . . . [the state statute's] real purpose is to provide relief to Holocaust victims and their heirs.").

Third, Defendants contend that "California's interest here is 'weak' because Plaintiff is a Chinese citizen and has not alleged that he has ever resided in California." Mot. at 14. However, Defendants' argument ignores the fact that the two corporate defendants in the instant case are headquartered in California. Compl. ¶¶ 8–9. California has a strong interest in the conduct of "its corporations and residents." *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 18 (N.D. Cal. 1986). Defendants' argument also ignores Plaintiff's allegation that Defendants allegedly made the decision to share communications, including Plaintiff's communications, with PRC authorities from Yahoo's California headquarters, where they allegedly learned of the request to share Plaintiff's communications and approved that request. *Id*. ¶ 44. California has a sstrong interest in remedying violations of its laws that occur within its borders. *See Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 933 (9th Cir. 2019) (stating that a jurisdiction has a strong "interest in regulating conduct that occurs within its borders").

Defendants have not shown that there is a likelihood that the UCL would have more than

an incidental impact on foreign policy. Furthermore, the UCL falls within a traditional state responsibility. Additionally, California has a strong interest in ensuring that its residents comply with the UCL within its borders. Accordingly, the foreign affairs doctrine does not bar adjudication of Plaintiff's UCL claim. Because the political question doctrine, the act of state doctrine, and the foreign affairs doctrine do not bar adjudication of the instant case, the Court concludes that the instant case is justiciable.

## C. Rule 8

Defendants assert that the Complaint should be dismissed because it fails to satisfy Rule 8. Mot. at 4–6. Specifically, Defendants contend that the Complaint fails to plead dates on which the alleged misconduct occurred. Moreover, Defendants assert a statute of limitations defense. The Court agrees with Defendants that Plaintiff's Complaint fails to satisfy Rule 8.

Federal Rule of Civil Procedure 8 requires that a complaint "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). This Court has previously noted that "a failure to plead when any alleged misconduct occurred will not necessarily be fatal under Rule 8." *Brodsky v. Apple*, 445 F. Supp. 3d 110, 135 (N.D. Cal. 2020). "However, where . . . an applicable statute of limitations defense has been raised and is non-frivolous," the Court has held that the "failure to plead the approximate date of the alleged misconduct fails to satisfy Rule 8's requirement to 'contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.'" *Id.* (quoting *Starr*, 652 F.3d at 1216). Other courts in this district have similarly dismissed complaints as insufficiently pled where they failed to include the dates of the alleged misconduct. *See, e.g.*, *Calip v. M.E.I.C.*, 2015 WL 5996365, at *6 (N.D. Cal. Oct. 15, 2015) (dismissing claim where the plaintiff did not "state when she was in the hospital and when her child passed away, without which the Court cannot determine whether Plaintiff brought her claims within the applicable statute of limitations period"); *Vasconcellos v. Sara Lee Bakery*, 2013 WL 4014520, at *2 (N.D. Cal. Aug. 5, 2013) (dismissing termination

United States District Court
Northern District of California

claim as insufficiently pled where complaint did not allege "when plaintiff worked for defendants, when plaintiff became injured or engaged in protected activity, or when the alleged misconduct occurred"); *O'Donnell v. U.S. Bancorp Equipment Finance, Inc.*, 2010 WL 2198203, at *3 (N.D. Cal. May 28, 2010) ("[T]he Court finds that O'Donnell has nonetheless failed to satisfy the pleading requirements of Federal Rule of Civil Procedure 8 because she has not alleged any dates in her complaint.").

In the instant case, the Complaint does not provide any dates as to when the alleged misconduct occurred. For instance, Plaintiff does not allege when he opened a Yahoo account, when he used his Yahoo account to send and receive pro-democracy materials, when he was arrested by PRC authorities, when he was confined and tortured by PRC authorities, and when he left China. *See* Compl. ¶¶ 48–70. Indeed, the only dates pleaded in the Complaint relate to the Tiananmen Square protests in 1989. *Id.* ¶¶ 1–3, 34. However, the Complaint alleges that those protests took place before Plaintiff began using his Yahoo account, so those protests are not relevant to the alleged misconduct in the instant case. *Id.* ¶ 34.

Moreover, Defendants raise the possibility of a statute of limitations defense. The applicable statutes of limitations are 10 years for Plaintiff's ATS and TVPA claims and 4 years for Plaintiff's UCL claim. *See Deutsch*, 324 F.3d at 717 (noting that the statute of limitations for the ATS and the TVPA is 10 years); Cal. Bus. & Prof. Code § 17208 (stating that the statute of limitations for a UCL claim is 4 years). In the instant case, judicially noticeable materials state that Yahoo stopped operating in the PRC in 2005, approximately fifteen years before the instant case was filed and outside of the applicable statutes of limitations. ECF No. 24 Exhs. A, B. Because Defendants raise the possibility of a statute of limitations defense, and because the Complaint does not plead any dates as to when the alleged misconduct occurred, the Court concludes that the Complaint is insufficiently pled under Rule 8. *See Brodsky*, 445 F. Supp. 3d at 135; *Calip*, 2015 WL 5996365, at *6; *Vasconcellos*, 2013 WL 4014520, at *2; *O'Donnell*, 2010 WL 2198203, at *3.

In Plaintiff's opposition brief, Plaintiff states that he was arrested in December 2003, remained imprisoned until December 2010, was arrested again in 2014, and arrived in the U.S. in August 2016. Opp'n at 5. However, in ruling on a motion to dismiss, the Court cannot look beyond Plaintiff's Complaint to Plaintiff's opposition brief. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1988) (stating that, in ruling on a motion to dismiss, "a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss"). Moreover, even if the Court were to consider the dates alleged in Plaintiff's opposition, the alleged misconduct, which allegedly occurred when Defendants shared Plaintiff's information with PRC authorities before Plaintiff's arrest, appears to have occurred outside of the applicable statutes of limitations. *See Deutsch*, 324 F.3d at 717 (noting that the statute of limitations for the ATS and the TVPA is 10 years); Cal. Bus. & Prof. Code § 17208 (stating that the statute of limitations for a UCL claim is 4 years).

Plaintiff's opposition invokes tolling. Opp'n at 4–6. However, Plaintiff's Complaint does not sufficiently allege the facts that might justify tolling, including the dates of any events that might justify tolling. *See* Compl. ¶¶ 48–70. "[F]ederal courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006); *see, e.g.*, *Session v. PLM Lender Servs.*, 2011 WL 6748510, at *4 (N.D. Cal. Dec. 22, 2011) (holding that the failure to plead facts regarding tolling was insufficient to "establish the equitable tolling of all statutes of limitation").[4] Accordingly, if Plaintiff intends to rely on a ground for tolling, Plaintiff must include allegations that support tolling in Plaintiff's Complaint.

Because the Court agrees with Defendants that Plaintiff's Complaint is insufficiently pled under Rule 8, the Court GRANTS Defendants' motion to dismiss. The Court does so with leave to

---

[4] To the extent that a plaintiff raises allegations of fraud, those allegations must be pled with particularity. *See* Federal Rule of Civil Procedure 9(b); *see also In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) ("[A]llegations of fraudulent concealment must be pled with particularity.").

28

amend because amendment would not be futile, unduly prejudice the opposing parties, or cause undue delay, and Plaintiff has not acted in bad faith. *See Leadsinger*, 512 F.3d at 532. Indeed, Plaintiff can cure this deficiency by adding allegations about the dates of the alleged misconduct and allegations regarding tolling.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss on the following grounds: Article III standing and justiciability. Specifically, the Court finds that Plaintiff has Article III standing to bring the instant case and that the political question doctrine, act of state doctrine, and foreign affairs doctrine do not render Plaintiff's claims non-justiciable. However, the Court GRANTS Defendants' motion to dismiss with leave to amend for failure to satisfy Federal Rule of Civil Procedure 8. Plaintiff shall file any amended complaint within 30 days of this Order. Failure to do so, or failure to cure deficiencies identified herein or identified in the instant motion to dismiss, will result in dismissal of the deficient claims with prejudice. Plaintiff may not add new causes of action or add new parties without stipulation or leave of the Court. Plaintiff is directed to file a redlined complaint comparing the complaint to any amended complaint as an attachment to Plaintiff's amended complaint.

**IT IS SO ORDERED.**

Dated: April 29, 2021

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No. 20-CV-06185-LHK
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND